## FIRST NAT. BANK OF ARDMORE v. GILLAM et al.

No. 16724. Opinion Filed Nov. 8, 1927.

Rehearing Denied Jan. 8, 1929.

H. C. Potterf, Earl Q. Gray, and J. M. Poindexter, for plaintiff in error.

Wm. G. Davisson, for defendants in error.

HALL, C. This was a controversy over the proceeds derived from the sale under foreclosure of certain personal property in which both parties claimed rights as mortgagees.

The plaintiff in error was defendant and defendant in error was plaintiff in the court below. For convenience the plaintiff in error occasionally will be referred to in this opinion as "the bank."

The basic disputed point is the construction of the mortgages held by the bank; that is, the construction as to the obligation secured by the two chattel mortgages, one original and the other a renewal, under which the bank claims the property. Also, the case involves the question of the rightful application by the bank of a certain payment to one of the two notes held by the bank against one E. E. Chivers, a mortgagor common to both the plaintiff in error and the defendant in error. The other matters are but incidental to these two main issues.

The gist of the controversy is that one E. E. Chivers was indebted to J. Robert Gillam, defendant in error, in the sum of $3,875; Gillam, on April 5, 1920, having paid a surety obligation on which Chivers was principal, received from Chivers a chattel mortgage on certain personal property consisting largely of domestic animals located in Johnston and Garvin counties. This mortgage was not filed until October 15th of that year. On June 10th of the same year, Chivers became indebted to the First National Bank of Ardmore, plaintiff in error,

238

in the sum of $2,000, and on that date gave, the bank his note and chattel mortgage covering the same property described in the Gillam mortgage. This mortgage to the bank was renewed on September 9th of the same year. It was conceded that the bank on June 10th and September 9th had no notice of the Gillam mortgage. Gillam's mortgage, therefore, was junior to the bank's mortgage for $2,000.

Chivers and a man named Velie Suggs had been automobile dealers operating under a trade name and partnership called "The Success Motor Company." This Success Motor Company was indebted to the bank in the sum of $5,000 evidenced by a balance on a note, which note was signed by the company and both Chivers and Suggs. The note was in existence and held by the bank on the date of the execution of the original mortgage to the bank, which was on June 10th. On October 9, 1920, the partnership note was split up and Suggs assumed one-half thereof, and Chivers assumed the other half, and on this date all of Chivers' indebtedness, that growing out of the Success Motor Company note, and the $2,000 note secured by the mortgage, less a credit of $1,144, was combined into one note. The court treated this circumstance as showing an intent to have this combined indebtedness secured by the mortgage, although this transaction occurred 30 days after the execution of the last mortgage. The court's instructions to the jury were based upon that theory. The plaintiff in error received the benefit of that assumption.

A few days before the Success Motor Company note was split up, and the evidence of the indebtedness took a new form, one Sigler, through a real estate transaction, became indebted to Chivers, and he (Sigler) borrowed from said bank $1,144, informing the bank that, the money was to be used by Chivers to apply on his (Chivers') indebtedness. Sigler drew his check payable either to the bank or its cashier and simply left it there. No agency for Chivers was claimed or shown. The bank applied the money as a payment on the note of the Success Motor Company. Chivers testified that as soon as he was advised that Sigler had left the money at the bank, he went to the bank to pay off the balance due on the mortgage note, and learned for the first time where the Sigler money had been applied. He then protested the application of the payment to the Success Motor Company note, and requested that the payment be applied on the $2,000 note. The bank

refused to make the application requested by Chivers.

On the question of notice of the Gillam mortgage, the evidence was in direct conflict. The jury decided that question against the contention of the bank, plaintiff in error.

Following the blank spaces for the insertion of the indebtedness which the mortgage was intended to secure, the original mortgage and renewal mortgage executed to the bank by Chivers, each contained a recital couched in a printed stock form to the effect that the mortgage was intended to secure all past, present, and future obligations of whatsoever nature of the mortgagor to the bank. The exact language of this mortgage will be set out hereinafter.

The bank contended that its mortgages, the original and renewal, covered all the indebtedness, including that designated and not designated, and therefore was entitled to all the proceeds from the sale of the property. The property was sold by the bank.

The defendant in error brought his action against the bank alleging that the bank was only entitled to a first mortgage on the property to secure the sum of $880 which was the balance due on the mortgage note after deducting the payment of $1,120, or $1,144, being the money which Sigler left in the bank for Chivers, which was to be applied on his indebtedness.

Under the holdings of the court below, the plaintiff in error should receive $2,339.71 of the $4,500, and the defendant in error should receive the sum of $2,160.29. That was the effect of the judgment.

It is first contended by plaintiff in error that its mortgage secured all the obligations of Chivers to the bank, although some obligations were not referred to in the mortgage except by a general stock recital embraced in the printed form of the mortgage.

As against that contention, defendant in error submits that the mortgages (original and renewal), upon which plaintiff in error claims priority, on their face, at least, raise a question as to whether there was any intent on the part of the bank and of Chivers that these mortgages should cover and include the debt of the Success Motor Company, when no attempt was ever made to insert it in the mortgages.

For our purpose the first question to be determined is whether or not the mortgage is capable of construction without resort

*to* parol evidence. If such is permissible in the present case, there is no necessity for a discussion of the question of the admissibility of parol evidence to explain any of the terms of the mortgage, or to apply the contract to its subject-matter, as per example, the debt really intended to be secured.

The essential facts upon which this phase of the case pivots are as follows:

(1) On June 10, 1920, E. E. Chivers gave his note for $2,000 to the First National Bank of Ardmore, and to secure the payment of said note executed a mortgage on certain personal property.

(2) On September 9, 1920, said Chivers gave a renewal note in the same sum ($2,000) to said bank, and as security for its payment executed a renewal mortgage covering the same property.

(3) On June 10th and on September 9th, the dates of the aforesaid notes and mortgages, the Success Motor Company was indebted to the said bank in the sum of $5,000, evidenced by a note signed by both Chivers and Suggs individually, as well a for the company.

(4) As to both substance and form, the mortgages (the original executed on June 10th, and the renewal executed on September 9th), contained the following pertinent provisions:

"* * * Whereas, I have, this day, executed and delivered my certain promissory note of even date herewith, payable to the First National Bank of Ardmore, Okla., or order, with interest from maturity until paid, at the rate of 10 per cent. per annum, as follows:

"One note for $2,000, due and payable on August 9, 1920.

"One note for $——, due and payable on —— 19——

"One note for $——, due and payable on —— 19——

—"and have agreed and do hereby specifically agree that this mortgage shall extend to, cover, and secure any and all extensions and renewals of said note——, and any and all other of my indebtedness and liabilities, whether as principal, surety or guarantor, or otherwise, to the First National Bank of Ardmore, Oklahoma. whether evidenced by note or otherwise, now existing or hereafter arising, due or to become due, before the foreclosure of this mortgage. * * *"

(5) All of the above matter was incorporated in the printed form except the insertion of the words and figures "$2,000" and

"August 9, 1920." The renewal mortgage was the same except the date of the maturity of the $2,000 note was noted as "October 9, 1920."

(6) The mortgages were prepared by the bank, and its regular printed forms were used.

(7) Neither mortgage makes any mention whatever of the Success Motor Company note held by the bank, although this indebtedness was in existence and in a definite and ascertained sum on the dates of both mortgages, June 10th and September 9th, and each mortgage contained two unused blank spaces in which this indebtedness of the Success Motor Company could have been specifically described if it had been intended to include the same along with the $2,000 indebtedness. This same situation existed and the bank, plaintiff in error, had the same opportunity to specifically enumerate this indebtedness in its renewal mortgage executed on September 9th.

The question of blanket mortgages is not involved in this controversy. Except as controlled by statute, blanket mortgages are everywhere considered legal. The question presented here is whether or not the bank, by virtue of the foregoing facts and provisions, can claim that the mortgages extended to and covered this other note or obligation of Chivers, when nothing further appears that this other indebtedness entered into the subject-matter and purpose of the execution of these mortgages.

We think not under the facts in the present case. **Belton v. F. & M. Bank & Trus** Co., 186 N. C. 614, 120 S. E. 220 (decided December, 1923), and Stroffer v. Rodman, 146 Ky. 1, Ann. Cas. 1913C, 549, and note.

This exact question was before the Supreme Court of North Carolina in the recent case above named, and we think the reasoning in that case is beyond any rational attack. The mortgage note is that case was in the following form:

,"$100. Stoneville. N. C. 15 December, 1920. On 15 December, 1921, after date, I promise to pay to the Farmers & Merchants Bank & Trust Company, or its order, at the office of said company at Stoneville, N. C., the sum of $100, with interest thereon at the rate of 6 per cent. per annum, for value received. I herewith deposit with the said company the following securities and properties, to wit: 'Deed of trust attached. same being renewal in part of note $200 due to Mrs. Coleman; and agree that the above-named properties and securities,

and any others added to or substituted therefor, shall be held as collateral security for the above obligation, and for any other obligation or liability of the undersigned to the said company now existing or which may hereafter be contracted and due or to become due." (Emphasis ours.)

In holding that the patent and stereotyped provisions in the printed or stock form of mortgage note did not make the same security for the other indebtedness to the bank, the court held:

"Where a mortgagor executed a renewal note to an assignee of the original secured note providing that the trust deed was to be held as collateral security for the note, 'and for any other obligation now existing, or which may be hereafter contracted,' and the trust deed required reconveyance of the property to mortgagor on payment of the note, held, that an independent indebtedness to the assignee was not secured, since the minds of the parties never met on that proposition.

"An agreement to secure one or more obligations must be confined to those intended to be secured by the parties to the contract, for nothing not within their contemplation will be included therein."

In the course of the opinion, Justice Stacy made the following observations:

"We are sure the minds of the parties never met on the proposition that the land conveyed in the deed of trust should stand as security for the payment of any debt other than the debt originally due Mrs. Coleman, and which she assigned to the bank after the payment of $100 had been made thereon."

A case very much in point on the question at issue is Shackleford v. Fitzgerald, 151 Ga. 35, 105 S. E. 597, decided in 1921. That case presents a concrete illustration of t' relative legal effect of general and "dragnet" descriptions and designations appearing in a printed form of an instrument, as against written matter inserted in the blanks therein apparently with a special view to the intention of the parties.

The Shackleford Case, supra, involved the construction of a timber lease for turpentine purposes. The lease was drawn on a regular printed blank form which provided and recited at several places in the printed part thereof that the lessee should have the right to box, work, and otherwise use all timber for turpentine purposes on the land described. The written portion designate' 42,000 boxes (meaning timber already boxed and in process of development for turpentine), and formerly boxed and worked by one Carnes, describing the land and stat-

ing the amount to be 4,300 acres. There was small timber on the land, which had never been boxed. The lessee, by virtue of the recitals in the printed form of the lease, contended that he had the right to box and use all the timber on the land described, which timber included the timber already boxed by Carnes and the timber which was unboxed as well. The lower court held that the contract was unambiguous and conveyed all the timber, boxed and unboxed. The Supreme Court reversed the lower court and adhered to a principle which is embodied in the universal law of contracts, as follows:

"* * * Held, that while certain parts of the printed lease might be broad enough to convey all timber for turpentine purposes standing upon the lands described, nevertheless, giving to the part that was written with pen and ink its proper weight and consideration, the instrument is effective to convey only the timber containing the 42,-000 boxes specified in the part of the instrument written with pen and ink in the absence of evidence tending to show more fully the intention of the parties, and to show that the restrictions in the written part of the lease are not to be so construed independently of the other portions of the lease."

In the course of the opinion, the court said:

"Moreover, where parts of a contract or instrument are in writing and other parts of it are printed, the parts in writing are to be given the greater weight. In the case of Surles v. Milikin, 97 Ga. 485 (25 S. E. 322), it was said: 'It is a well-settled rule, in construing contracts, such, for instance, as policies of insurance, the main portions of which are printed and the special or particular portions adapting it to the precise agreement of the parties are written, that the written words should be given greater force and effect than those which are printed. That rule is applicable in prinpicle to the present case.'"

The case at bar, as well as the North Carolina and Georgia cases above discussed, rest upon the following elementary, as well as fundamental, principles of the law of contracts.

(1) The rule of **"expressio unius exclusio alterius"** (the expression of one thing is the exclusion of another).

This rule as applied to instruments which are in part printed and in part written is stated by Parsons in his treatise on Contracts, vol. 2 (9th Ed.) 672, in the following language:

"What is printed is intended to apply to

large classes of contracts, and not to any one exclusively; the blanks are left purposely, that the special statements or provisions should be inserted, which belong to this contract, and not to others, and thus discriminate this from others. And it is reasonable to suppose that the attention of the parties was more closely given to those phrases which they themselves selected, and which express the especial particulars of their own contract, than to those more general expressions which belong to all contracts of this class."

The Supreme Court of Michigan, in the case of Thompson E. W. C. v. Peerless, 190 Mich. 496, in holding that, as against general expressions, the specific expressions control in the interpretation of contracts, quoted with approval the case of Torrence v. McDougald, 12 Ga. 526, in which case it is said:

"The rule of construction applicable to all writings, Constitutions, statutes, contracts, and charters, public or private, and even to ordinary conversation, is this: That general and unlimited terms are restrained and limited by particular recitals, when used in connection with them."

(2) It is universally conceded that the paramount rule for the interpretation of contracts is to ascertain, if possible, the intention of the parties. It is often said: "To this rule all others are subordinate." 6 R. C. L. 835. In Oklahoma this matter is safeguarded by statute, sections 5039 and 5051, C. O. S. 1921. To hold anyone bound to an obligation to which he has never assented would not only be the height of injustice, but would make the courts instruments of oppression, and would be a subversion of their very purpose. This principle has been applied by this court in numerous cases, some of which are as follows: Wolfe v. Blackwell Oil & Gas Co., 77 Okla. 81, 186 Pac. 484; Cotner v. Mundy, 92 Okla. 268, 219 Pac. 321; and Hammit Oil Co. v. Gypsy Oil Co., 95 Okla. 235, 218 Pac. 501, 34 A. L. R. 275.

(3) The surrounding circumstances are to be looked to as reflecting the true intention of the parties to a contract.

This rule is stated by this court in the case of Iron Mountain Oil Co. v. Edwards, 100 Okla. 4, 227 Pac. 150, in the following language:

"In construing written instruments the court must place itself, as far as possible, in the position of the parties when the contract was entered into; and consider the instrument itself as drawn, its purpose and the circumstances surrounding the transaction; and, from a consideration of all these elements, determine upon what sense or meaning of the terms used their minds actually met."

The above rule was aptly stated by the Supreme Court of California in Walsh v. Hill, 38 Cal. 481, 60 Pac. 91, as follows:

"In construing a written instrument, the only rule of much value is to place ourselves as nearly as possible in the places which were occupied by the parties at the time the instrument was executed, **and then, taking the contract by its four corners, read it.**" (Emphasis ours.)

Judge Sanborn, in the case of Kaufman v. Raeder, 47 C. C. A. 278, stated the rule in the following language:

"The situation of the parties when a contract is made, its subject-matter, and the purpose of its execution, are always material to determine the intention of the parties and the meaning of the terms they used, and **when these are ascertained they must prevail over the dry words of the agreement.**" (Emphasis ours.)

Irrespective of stereotyped or general printed provisions appearing in a contract, the literal or sweeping terms of a contract may never prevail over what appears to the court to be the rational and general intent of the parties thereto. In a leading case, Chism v. Schipper, 51 N. J. 1, the New Jersey Supreme Court, in a very exhaustive opinion on this question, made the following observations:

"But the adverse argument is, that the agreement of the parties is to be ascertained from the plain language used by them, and such agreement is to be enforced, no matter what the intention may have been. This is the general rule, beyond a doubt, but such required literalism is not to be pushed to the preposterous length of requiring that by its operation the general intention of the parties, as evidenced by their contract itself, shall be frustrated or perverted, either in whole or in part. The terms employed are servants and not masters of the perspicuous intent; they are to be interpreted so as to subserve and not to subvert such intent." Text of 6 R. C. L. 841-842.

(4) With respect to mortgages, one of the rules of construction in determining the debt or liability secured is that which the parties themselves, by their conduct, put upon the mortgage. 41 C. J. 454, sec. 345.

(5) In construing a mortgage any doubt or uncertainty as to the obligation secured operates against the mortgagee. Bowen v. Ratliffe, 140 Ind. 393, 39 N. E. 860; Kline v. McGuckin, 25 N. J. Eq. 433.

(6) Another accepted rule of construction of mortgages is, where the terms of the

242

mortgage are doubtful, it will be construed most strongly against the party who prepared it or caused the uncertainty to exist. Graham v. National Surety Co., 244 Fed. 915; Fannin v. Devine, 294 Ill. 597, 128 N. E. 745; Owens v. Graetzel, 146 Md. 361, 126 Atl. 224, 39 A. L. R. 943; Sac City Canning Co. v. Griffin Grocery Co., 99 Okla. 99, 225 Pac. 702.

Counsel for plaintiff in error rely on a number of cases cited in a note in 1 A. L. R. 1589, which cases relate to the question of the "future advance" clause in mortgages. These cases do not support the theory of plaintiff in error. It may be definitely said that mortgages given to secure a specified sum and for future advances are everywhere considered legal, except perhaps in one or two jurisdictions. Mortgages of this class, like mortgages of indemnity, or mortgages to secure against official neglects, must necessarily be intended to secure indefinite and uncertain sums at the time the mortgages are executed.

The gist of the holding in the cases they cite is that, when subsequent advencements are made by the mortgagee, the future advance clause raises a presumption that such was intended by the parties. This clearly appears from the holding and language of the court in Citizens Saving Bank v. Kock, 117 Mich. 225 (relied on by plaintiff in error), which is as follows:

"The learned circuit judge decided that the presumption arising from the execution of the mortgage had not been overcome by the proof offered by the defendants. We are satisfied upon examination of the record that no misrepresentation was made to the defendants, and that, on the contrary, Mrs. Kock was informed that the instrument was intended to secure all paper indorsed by Mr. Kock." (Emphasis ours.)

Another case cited and relied on by plaintiff in error is Huntington v. Kneeland, 102 App. Div. 284, 92 N. Y. Supp. 944. That case was quoted and used as an authority for the decision in Belton v. F. & M. Bank, supra, quoted at length in this opinion. The case of Paschal v. Bohannan, 59 Okla. 139, 158 Pac. 365, is neither controlling nor authority here. That case involved a present stated indebtedness, and a clause providing for future advances which obligation could not be defined except in general terms. The future advances were made by the mortgagee.

Substantially the same facts and principles were involved in the case of Citizens Saving Bank v. Kock, supra, although it appears that the conclusion therein reached in

that case was upon somewhat different grounds, as will be observed from the above quotation from the opinion.

The present case involves no future advances, and the obligations were existing, fixed, and certain, at the time of the execution of each mortgage, and one of the obligations was designated and secured by the mortgage, and the other was not. Whether all that was said in the Bohannan Case, supra, is sound or unsound law has no application to the case at bar. That case is the law governing the particular facts embraced therein, and must, as a general statement of the law, be considered in the light reflected by the following authorities: Berry-Beall Dry Goods Co. v. Francis, 104 Okla. 81, 230 Pac. 496; Wilbur v. Jones, 80 N. J. Eq. 520, 86 Atl. 769; Jones v. Guaranty, etc., Co., 101 U. S. 622; Lindsay v. Garvin, 31 S. C. 259, 9 S. E. 862, 5 L. R. A. 219; Colman v. Post, 10 Mich. 422, 82 Am. Dec. 49; Johnson v. Bratton, 112 Mich. 319, 70 N. W. 1021; Jones Commentaries on Evidence, vol. 4 (2nd Ed.) p. 3040; L. R. A. 1916B pp. 27, 54, 61, 62; Brick v. Brick, 98 U. S. 514, 25 L. Ed. 256; Weiser Loan & Trust Co. v. Comerford (Idaho) 238 Pac. 515; Peterson v. Willing, 3 Dall. (U. S.) 506, 1 L. Ed. 698; 19 R. C. L. 391.

Plaintiff in error next contends that the court erred in not submitting to the jury the issue as to the existence of the Gillam mortgage on or before October 9th. There was some evidence or circumstances introduced in support of that issue, but it is unnecessary to pass on the question as to whether or not that evidence was sufficient to submit the issue to the jury, in view of the fact that Gillam's mortgage was actually filed on October 15th, and the bank's mortgage never did cover any of the Chivers indebtedness except the original $2.000 loan. Assuming that the Gillam mortgage was not in existence on October 9th, and assuming that on that date it was the intention of the bank and Chivers that, upon the consolidation of the indebtedness secured by the mortgage and the indebtedness of the Success Motor Company into one note and this transaction should be retroactive, and this combined indebtedness should be secured by the mortgage previously executed on September 9th, we are of the opinion that the mortgage under consideration would not secure the indebtedness of the Success Motor Company. It perhaps would be otherwise if the bank were relying on an equitable mortgage, in which instance the mortgage would be an equitable obligation, resting in parol, and would necessarily bear the date of the com-

bined indebtedness, and of the agreement of the parties. That is not the present case. The written mortgage is relied on instead, which was executed one month before the consolidation of this indebtedness. Of course, so long as the debt secured remains unpaid, neither the renewal or substitution of the evidence of the debt will impair the lien of the mortgage. The rule which governs this phase of the case is stated in R. C. L. vol. 19, p. 306, as follows:

"* * * A mortgage cannot, subsequent to its execution, be extended by parol agreement to secure debts or obligations other than those which it was executed to secure. Such an extension, if effective, would be equivalent to the execution of a new mortgage to secure the additional obligations." James v. Morey, 2 Cow. (N. Y.) 246, 14 Am. Dec. 475; Lindsay v. Garvin, 31 S. C. 259, 9 S. E. 862; Jones, Chat. Mort. (5th Ed.) 148; Wright v. Voorhees, 131 Iowa, 408, 108 N. W. 758, 9 Ann. Cas. 1149; and Estate of Dunlap v. Gibson Ice Cream Co., 184 Wis. 345, in which case it was held that:

"Where the bill of sale expressed as the consideration thereof the exact amount of a loan then made and was silent on its face, **and there is no evidence as to any th'en intent that it should be security for more than that amount, it could not, by the mere expression of such intent in notes subsequently executed, be deemed to include such notes.**" (Emphasis ours.)

Plaintiff in error next contends that the court erred in holding that the credit of $1,144 left at the bank by Sigler should have been credited upon the $2,000 note of Dr. Chivers instead of the note of the Success Motor Company.

It clearly appears that within a reasonable time after Chivers learned that Sigler had left the money, the $1,144, at the bank, he requested its application as a payment on his individual note, the note for $2,000.

Therefore, the general rule requiring a request for its application to a particular debt or indebtedness at or before the payment, does not apply. Instead, the rule announced by the Supreme Court of Mississippi in the case of Dennis, Perkins & Co. v. Jones & McLaurin, 31 Miss. 606, applies here:

"If the creditor procure possession of the money of his debtor, without his consent (unless it be by a legal proceeding binding on the debtor), the latter does not thereby lose his right to make application of the funds so obtained to any one of several demands held by the creditor against him; nor will he be bound by an application made by the creditor."

For the reasons herein stated, the judgment of the court below is hereby affirmed.

TEEHEE, REID, DIFFENDAFFER, and FOSTER, Commissioners, concur.