## SECURITY BANK v. FIRST NATIONAL BANK

77-368                                    565 S.W. 2d 623

Opinion delivered May 22, 1978
(Division II)

*Branch & Thompson,* for appellant.

*Cathey, Goodwin & Hamilton,* for appellee.

GEORGE HOWARD, JR., Justice. We are to decide whether the trial court's holding that a deed of trust executed by Gene Prater and Shirley Prater, his wife, on November 13, 1974, whereby their home was to secure a promissory note in the sum of $16,000.00 representing a loan as purchase money for their home, also secures business loans made to Gene Prater individually, prior and subsequent to the loan of November 13, 1974, is supported by a preponderance of the evidence.

## THE FACTS

On November 13, 1974, Gene Prater and Shirley Prater, his wife, executed a deed of trust to First National Bank of Paragould, Arkansas, hereinafter referred to as First National, offering the following described real property, which is their personal dwelling, to secure a promissory note

which was also executed by both of the Praters and is also dated November 13, 1974, in the amount of $16,000.00:

> That part of the Northeast Quarter of the Southeast Quarter of Section 9, Township 17 North, Range 6 East as described as follows: Beginning at the Southeast corner of said tract; run thence West 321.5 feet to the West right of way of State Highway 1, the true point of beginning, run thence North 31 degrees 10 minutes East along said West right of way of said Highway 210 feet, run thence North 81 degrees 50 minutes West 395 feet, run thence South 31 degrees 10 minutes West 275 feet, run thence East 425 feet to the true point of beginning, containing 2.0 acres, more or less.

The deed of trust was duly filed for record in the office of the ex-officio recorder in and for Greene County, Arkansas.

The deed of trust contains the following provision which is located immediately below the description of the property:

> "This trust deed secures not only the indebtedness hereinafter described but any other indebtedness now or hereafter owing by the parties of the First Part, or either of them, to the party of the Third Part at any time prior to the release or foreclosure of this instrument. If any default be made with respect to the indebtedness hereinafter described or any other indebtedness secured by this trust deed, then the party of the Third Part may, at its option, declare all indebtedness due and payable at once."

On June 14, 1976, Gene Prater, individually and doing business as Prater's Electrical and Wiring Company, executed a note to First National in the amount of $39,546.81. This note was a composite of a series of notes executed by Gene Prater individually. The first note of the series of notes was in the amount of $2,500.00. As security for this first note, First National received a security agreement on a Tappan Heat Pump. The security agreement, as well as a lien statement, were duly filed for record; a second note involving the sum of $28,000.00 was executed by Gene Prater individually, and First National received as collateral for this note certain

business equipment; a third note in the sum of $6,600.00 was secured by two gas and electric cooling units and two heat pumps; a fourth note in the amount of $5,000.00 and dated November 15, 1974, was secured by a $1,000.00 certificate of deposit and a 1972 Econoline Ford Van; and a fifth note in the amount of $2,200.00 was secured by 75 sheets of .26 gauge sheet metal. The latter designated notes were all signed individually by Gene Prater and were to secure business debts.

On October 19, 1976, appellant, Security Bank, extended a $10,000.00 loan to Gene and Shirley Prater which was evidenced by a promissory note. This note was secured by a second mortgage on the home of the Praters. The mortgage given to Security Bank likewise contains a clause stating that the mortgage would also "secure the payment of any indebtedness now due or that may become due the Mortgagee by the Mortgagor or either of them up to the foreclosure of this instrument."

On September 17, 1976, the Praters secured a second loan from Security Bank in the amount of $1,499.76 for the purpose of putting down a well at their home. This loan was evidenced by a promissory note. On February 14, 1977, the Praters acquired a home improvement loan from Security Bank in the amount of $4,532.04 in order to construct a carport.

On March 29, 1977, First National instituted foreclosure action on the note and deed of trust executed by Gene Prater and Shirley Prater jointly on November 13, 1974, and on the note of June 14, 1976, executed by Gene Prater individually and doing business as Prater's Electrical and Wiring Company. First National alleged that the Praters were in default with their payments and that First National was entitled to a judgment on the note of November 13, 1974, with a balance remaining of $14,315.68, and the sum of $38,367.68 representing the unpaid principal and interest on the note of June 14, 1976, a decree of foreclosure and also a decree declaring that First National's judgments possessed priority status to any claims of Security Bank. Security Bank was also made a party-defendant to the action.

Security Bank filed its answer admitting that Gene and Shirley Prater had executed and delivered a mortgage to Security Bank involving the lands described in First National's complaint securing an indebtedness of $10,000.00. However, Security Bank denied that the note executed by Gene Prater on June 14, 1976, to First National was entitled to priority status over its mortgage by virtue of the "dragnet" provision or "other indebtedness clause" contained in the deed of trust executed to First National. Moreover, Security Bank further denied that the loans extended to Gene Prater individually and evidenced by the note of June 14, 1976, bore any relationship to the original debt on the home of the Praters as secured by the deed of trust to First National on November 13, 1974. And, as a consequence, all of Security Bank's claims have priority over the note of November 13, 1974, to First National.

Security Bank also filed a cross-complaint for foreclosure on the mortgage that it received from the Praters on October 19, 1976, alleging that as a consequence of the foreclosure action instituted by First National against the Praters, Security Bank's interest in the real property in question was in jeopardy. Security Bank prayed for a judgment in the amount of $10,492.18 which represented the present balance due under the note executed by the Praters on October 19, 1976, a judgment for the balance due under the note executed by the Praters on September 17, 1976, in the amount of $1,178.17, and on the note executed February 14, 1977, with a balance due in the amount of $3,855.02.

## HOLDING OF THE TRIAL COURT

The trial court found that the note executed by Gene Prater and Shirley Prater on November 13, 1974, and the note executed by Gene Prater individually on June 14, 1976, in the sum of $39,546.81, including interest and in addition thereto, an attorney's fee, were secured by the deed of trust of November 13, 1974, by reason of the "other indebtedness clause". In other words, the notes held by First National took priority over the notes executed jointly by Gene Prater and Shirley Prater to Security Bank.

However, the court awarded a judgment to Security

Bank on the note dated October 19, 1976, interest as well as attorney's fees and a judgment on the note of September 17, 1976, and the note of February 14, 1977. The court found that all of these notes were secured under the second mortgage given by the Praters under the "other indebtedness clause."

## THE DECISION

We deem it advisable, at the outset, to deal with an inquiry made on the part of the trial court as to the standing of Security Bank to challenge the priority status claimed by First National for those notes executed by Gene Prater individually for his business venture and as evidenced by the note of November 13, 1974.

Appellee argued strenuously that Gene and Shirley Prater did not file an answer to First National's complaint and as a consequence, were in default. Therefore, the Praters, for all practical purposes, had admitted or it is established that it was the intention of the parties that First National's deed of trust would secure the business debts of Gene Prater. In this regard, the trial court made the following observation in its opinion:

> ". . . In this case here, the borrowers raise no defense at all and there is a question in my mind as to whether or not the second lender here, the Security Bank as to whether or not they can raise the defenses that the Praters may raise in regard to this loan with First National Bank."[1]

We hold that Security Bank had standing to raise and litigate the question of the priority of the note executed by Gene Prater individually to First National on June 24, 1976. Priority status conferred on the note of June 14, 1976, indeed, meant the difference between Security Bank receiving a repayment on the indebtedness of the Praters and receiving only a part or none at all. It is clear, from the record, that whatever proceeds are derived from the sale of the real

---

[1] It appears from the evidence in this case that the whereabouts of the Praters are unknown.

property will not be sufficient to pay off the obligations due both First National and Security Bank.

Under our civil code, substance is preferred over form in procedural matters. Consequently, to hold that Security Bank did not have standing to raise the issue of priority would in effect elevate form to the lofty position of substance.

Moreover, First National has not demonstrated how it has been prejudiced by permitting Security Bank to raise the defenses asserted. It must be remembered that Shirley Prater was a joint owner of the homestead and she did not sign any of the business obligations of Gene Prater. It would appear that the posture taken by Security Bank in this action is a position that may be characterized as common to both the Praters and Security Bank. Security Bank's interest was, indeed, real and vital. We, therefore, conclude that Security Bank had standing to assert the defenses raised by it in this case.

Turning now to the fundamental issue involved, in *American Bank & Trust Co.* v. *First National Bank of Paris,* 184 Ark. 689 (1931), 43 S.W. 2d 248, we said, inter alia:

> "One may execute a valid mortgage to secure a debt to be contracted in the future . . . but, in order to do so, there must be an unequivocal agreement in the instrument itself that it is given for debts to be incurred in the future . . .

> " 'The effect of our cases is that a mortgage to secure future advances . . . is valid, but, if such purpose is intended to be accomplished, that fact must clearly appear from the instrument, and such purpose will not be presumed where the instrument does not contain a general description of the indebtedness secured so as to put one who examines it on notice that this was its purpose in order that such person may pursue the inquiry which such knowledge would suggest.' . . .

> "*The circumstances attendant upon the execution of the mortgage and the nature of the transaction subsequent thereto are always matters of consideration in determining the effect of the*

*mortgage, and, as these circumstances and the language of the instruments vary . . . "* (Emphasis added)

In *Hendrickson* v. *Farmers' Bank & Trust Company*, 189 Ark. 423, 73 S.W. 2d 725, we said:

> "As suggested by our early cases, in the construction of a mortgage the real question is, 'what was the intention of the parties to the mortgage?' In determining this all the circumstances attendant upon the execution of the mortgage and the nature of the transaction itself are to be considered; . . . and, in order to extend the intention of the parties beyond the primary purpose of the mortgage so as to secure the payment of debts other than those specifically mentioned, from our decisions and principles of natural justice the following rule may be deduced: where a mortgage is given to secure a specific debt named, the security will not be extended as to antecedent debts unless the instrument so provides and identifies those intended to be secured in clear terms and, to be extended to cover debts subsequently incurred, *these must be of the same class and so related to the primary debt secured that the assent of the mortgagor will be inferred.* The reason is that mortgages, by the use of general terms, ought never to be so extended as to secure debts which the debtor did not contemplate. . . . " (Emphasis supplied)

In considering the circumstances involving the execution of the deed of trust by Gene and Shirley Prater to First National on November 13, 1974; the note of June 14, 1976, executed by Gene Prater individually and doing business as Prater's Electrical and Wiring Company, and the purpose for which the funds were used, and the circumstances surrounding the negotiation and granting loans by Security Bank to the Praters, as evidenced by notes dated October 19, 1976, September 17, 1976, and February 14, 1977, we are of the view that the deed of trust of November 13, 1974, executed to First National by the Praters does not secure the prior and subsequent loans made to Gene Prater individually and as evidenced by the note of June 14, 1976. Consequently, the holding of the trial court giving priority status of the note of June 14, 1976, over the note executed by the Praters to

Security Bank is not supported by a preponderance of the evidence and, accordingly, we reverse the trial court.

It is clear from the evidence that the $16,000.00 indebtedness created by the Praters on November 13, 1974, was a joint obligation payable to First National for purchase money towards the Prater's home. While on the other hand, the note of June 14, 1976, in the sum of $39,546.81 was a composite of a series of loans made by Gene Prater individually for business obligations. Shirley Prater did not execute any of these instruments. Moreover, First National took a security agreement on personal property used by Gene Prater in his business venture as collateral for these indebtednesses. It is obvious that these business loans are not of the same class as the obligation created by the Praters in connection with the purchase of their home. Nor were the business indebtednesses created by Gene Prater specifically described or designated in any way in the deed of trust that First National relies upon as affording it security for these business debts.

Appellee argues that its deed of trust, which expressly contains a provision securing additional or future advances, to either of the Praters, even up to the time of the foreclosure of the document, was duly filed for record; that during a telephonic conference, appellant's representative had been told of the extent of the Praters' debts with First National and that appellee was looking to security provided by the trust deed for the payment of these debts, and, consequently, appellant was put on notice. We are not impressed with this argument inasmuch as the recorded deed of trust made no reference to the business debts of Gene Prater. Moreover, there was not even a marginal entry specifying the extent of these business obligations or the purpose for which they were made.

Relative to the actual notice or advice offered by appellee to Security Bank during the telephonic conversation, the record reflects the following:

Max Redwine, loan officer for First National, testified as follows:

"Q. You never told him that you were going to look to any security in that home mortgage in that telephone conversation except that first $16,000.00 note, did you?

"A. I told him just exactly what I said the first time, that we had other indebtednesses involved.

"Q. And that was the sum and substance of it, you had other indebtednesses involved and you advised him not to make the loan.

"A. I advised him not to proceed with the loan. That's correct.

"Q. Now you didn't talk about equity in any way, shape, form or fashion in that conversation, did you?

"A. I don't believe I used the word, 'Equity.'

.   .   .

"Q. And that was simply advice to Mr. Bland and not any conversation in relation to equity or anything else, isn't that true?

"A. Well, that's essentially correct."

Mr. Redwine further testified as follows:

"Q. At no time, Mr. Redwine, did you or any member of the bank come up and endorse on the margin the mortgage you took and introduced into evidence, these additional debts you now claim, did you?

"A. No, sir."

Brenda Williams, note teller at First National, testified as follows:

"Q. And in truth and in fact, you didn't discuss any equity in that house and you didn't tell Herb Bland nor this girl that the Security Bank was claiming these business debts under this home mortgage, did you?

"A. No, sir."

Herbert Francis Bland, Vice President of Security Bank, testified as follows:

"Q. Who did you talk to?

"A. I talked to Max Redwine.

"Q. All right, would you, just as you could, relate to us what you remember happening or being said in that conversation?

"A. He indicated that they had a mortgage on the house, a debt against the house of $14,000.00 and something.

"Q. Did you ask him what the payoff was against the house?

"A. I asked him what the balance was.

"Q. What did he tell you?

"A. $13,000.00 or $14,000.00, then he also told me that they had an additional debt down there at the bank but it was on the business.

"Q. They had an additional debt but that it was on the business?

"A. Yes.

"Q. At any time during this conversation did Mr. Redwine tell you that the bank was looking to that home as collateral for the business debts?

"A. No."

The trial court in holding adversely to Security Bank relied principally upon our case *Benton State Bank* v. *Reed,* 240 Ark. 704, 401 S.W. 2d 738. *Benton* is to be distinguished from the instant case. In *Benton,* it is clear that all of the loans in-

volved were for business purposes and, consequently, were of the same class. Moreover, it is clear in *Benton* that all of the notes evidencing the business indebtednesses were executed by both the husband and wife who were the joint owners of the business.

Reversed and remanded for proceedings not inconsistent with this opinion.

We agree. HARRIS, C.J., and BYRD and HICKMAN, JJ.