**FIRST NATIONAL BANK, CORTEZ, COLORADO, a United States banking corporation, Appellant (Plaintiff),**

v.

**FIRST INTERSTATE BANK, RIVERTON, WYOMING, A United States banking corporation, Appellee (Defendant).**

No. 86–283.

Supreme Court of Wyoming.

May 26, 1989.

Lawrence J. Wolfe, Julie E. Trenerry, and Timothy Kingston, Holland & Hart, Cheyenne, for appellant.

Joel M. Vincent, Hettinger, Leedy & Vincent, Riverton, for appellee.

Before CARDINE, C.J., and THOMAS, URBIGKIT, MACY and GOLDEN, JJ.

THOMAS, Justice.

Upon the rehearing which the court granted in this case, the majority became convinced that the original opinion of the court was in error.[1] The issue now to be resolved is whether a secured party must set forth in a security agreement or financing statement with specificity the amount of any antecedent indebtedness that the instrument secures or yield priority to a subsequent creditor if it fails to do so. The court has concluded that, so long as a security interest is properly perfected, priority is not lost under such circumstances because the subsequent creditor has the notice required by law which permits it to ascertain the facts relative to the antecedent indebtedness In the original opinion of the court, the conclusion was reached that the subsequent creditor could prevail, with the court primarily relying upon precedent which requires that, in situations involving the mortgage of real estate, the intent of the parties is controlling. The prior opinion of the court in this case now is vacated, and the judgment of the district court is affirmed.

In the initial briefs filed in this case, the respective parties articulated certain issues to be addressed. The appellant, First National Bank, Cortez, Colorado (Cortez Bank), stated the issues to be reviewed as:

"A. Will aircraft collateral used to secure a promissory note which is recorded with the FAA in the form of a security agreement also serve to secure a separate antecedent debt which has not been recorded with the FAA to the detriment of a third party who also claims pursuant to a properly perfected security agreement?

"B. Should a properly recorded security agreement have priority over an antecedent debt which has not been properly recorded where the antecedent debt is not specifically set forth in a security agreement?

"C. Did the Lower Court err in holding in favor of an antecedent debt without considering the intent of the parties?"

As appellee, the First Interstate Bank of Riverton, N.A. (Riverton Bank), offered this statement of issues:

"1.1 Whether federal law or state law determines the effect of filing.

"1.2 Whether First Interstate held a prior perfected and superior security interest in the aircraft with regard to that security interest held by Cortez.

"1.3 Whether Cortez can raise the issues set forth in its brief or in the alternative, has standing with regard to those issues."

In its Brief in Support of Appellee's Petition for Rehearing, the Riverton Bank then articulated the following issues:

"3.1 The District Court in and for Fremont County, Wyoming, Ninth Judicial District will not be able upon remand to conduct proceedings in accord with the majority opinion of this Court in that the aircraft in question was sold with other collateral by First Interstate, in bulk, for a price of $70,000.00, and therefore, there is no method by which to determine what portion of the $70,000.00 received by First Interstate is attributable to the aircraft.

"3.2 The decision of the majority opinion is contrary to the intent of the drafters of the Uniform Commercial Code, settled opinion of learned authorities, and to the intent of the legislature of the State of Wyoming in adopting the Uniform Commercial Code.

"3.3 Whether the opinion of the majority violates Section 6 of the Wyoming Constitution, that being the protection of due process of law in that the same is an unreasonable restraint upon the freedom of contract.

"3.4 Whether the majority opinion usurps the authority of the legislature with a consequent and adverse impact upon banking and commerce in the State of Wyoming to the detriment of its citizens."

The Cortez Bank does not articulate issues on rehearing but, instead, summarizes its position with these statements:

---

1. *First National Bank, Cortez v. First Interstate* *Bank, Riverton,* 758 P.2d 1026 (Wyo.1988).

"I. Appellee's security agreement was inaccurate and therefore misleading. It was ineffective to perfect appellee's interest in the airplane and FNBC is entitled to the sale proceeds.

"II. The other arguments raised in the petition for rehearing are without merit."

There is no need to consider constitutional arguments in this case. The other issues are resolved adequately by the disposition of the case in accordance with a standard application of the Uniform Commercial Code. In summary, that application leads to the conclusion that the security agreement was adequate to secure antecedent indebtedness as between the parties to it and, therefore, was binding upon them and their successors in interest with notice. The security agreement was perfected in accordance with the Uniform Commercial Code, and the Cortez Bank is presumed to have had notice of it. The notice was sufficient to put the Cortez Bank upon inquiry, and nothing in the record suggests that it could not have discovered that antecedent indebtedness was secured, and the amount thereof, had it made an appropriate inquiry as the Uniform Commercial Code contemplates.

The material facts, which are not disputed by the parties, can be readily summarized. On August 7, 1981, Richard and Verlene Walker (Walkers) borrowed about $93,000 from the Riverton Bank. They gave the Riverton Bank a promissory note on that occasion which was secured by property identified as "Rigs." That note was renewed on July 27, 1982, at which time the Walkers owed the Riverton Bank about $77,000, and was secured by "2 Drilling Rigs." The next transaction is the critical one. On April 6, 1984, the Walkers asked to borrow an additional sum which was loaned by the bank upon a security agreement which encumbered the Walkers' 1979 Cessna airplane. The security agreement showed the principal amount as $7,328.35, but it also included the following statement:

"(Check and initial if applicable X /s RW VW.) In addition to the Note, this security agreement secures all amounts I owe to the Bank, whether now or later. This means that every loan I have now or get later is secured by this security agreement, as well as any other amount I may owe to the Bank (such as an overdraft on my checking account)."

This statement was checked in the appropriate place and initialed by each of the Walkers. At that time, the Walkers owed the Riverton Bank $77,605.63, which was the balance due on the previous promissory note.

The Riverton Bank filed its security agreement with the County Clerk and Ex-Officio Register of Deeds in and for Fremont County, Wyoming on April 12, 1984. On May 9, 1984, the security agreement was also filed with the Federal Aviation Administration (FAA).

On August 7, 1984, Richard Walker, d/b/a R & R Drilling, obtained a loan from the Cortez Bank. That loan, in the amount of $58,836.73, was secured by the same Cessna airplane. The record is silent as to any investigation made by the Cortez Bank prior to making the loan even though the district court found that the Cortez Bank relied upon a title search of the airplane before making the loan to Walker. In November, an examination was made of the FAA title record by Federal Aviation Title Company which reflected the situation as of November 23, 1984. It indicated that the original amount secured by the Riverton Bank's security agreement was $7,328.35, but made no reference to the clause that secured all amounts owed. The title examination also reflected the fact that the Cortez Bank recorded its security agreement with the FAA on September 14, 1984.

Subsequently, having obtained peaceful possession, the Riverton Bank sold the Cessna airplane. The sale was made in bulk with other collateral in the possession of the Riverton Bank for $70,000. The Riverton Bank retained the entire proceeds of the sale.

This action then was instituted by the Cortez Bank seeking a declaratory judgment that it was entitled to the proceeds from the sale of the aircraft in excess of

the sum of $7,328.35 specified in the security agreement recorded with the FAA on May 9, 1984 by the Riverton Bank. The district court ruled that the substantive effect of the recordings which perfected the respective security interests was controlled by state law. It held that the security agreement should be given effect according to its terms between the parties to it and any subsequent purchasers, if it had been properly perfected. It applied a presumption of notice to subsequent purchasers resulting from the proper filing of a security agreement and ruled that, having notice, the Cortez Bank could have obtained the appropriate information necessary for making its loan to the Walkers. The court then ordered that the declaratory judgment be granted to the Riverton Bank against the Cortez Bank, and this appeal was taken from that judgment.

The essence of the dispute, as presented in this court, is found in the claim of the Cortez Bank that it was misled by the amount recited in the security agreement and that, consequently, the security agreement is not effective with respect to any indebtedness other than that amount. The Riverton Bank argues that this is not a proper construction of the Uniform Commercial Code and the applicable authorities; that it gave value for the security interest it acquired in the Cessna airplane; that it properly perfected its security interest; and that it was properly entitled to priority with respect to its security interest.

If collateral is not in the possession of the secured party, it is necessary that the debtor sign a written security agreement containing a description of the collateral and manifesting the intention of the parties to create a security interest in that collateral. *WYHY Federal Credit Union v. Burchell,* 643 P.2d 471 (Wyo.1982); 8 R. Anderson, Uniform Commercial Code § 9-203:17 at 669-70 (3d ed. 1985). If value has been given, and the debtor has rights in the collateral, the security interest attaches and becomes enforceable against the debtor with respect to the collateral as soon as all of the minimal requirements have been met. Section 34-21-922, W.S. 1977; Uniform Commercial Code (U.L.A.)

§ 9-203, Comment 1, 1972 Official Comment (rev. 1981). As defined by § 34-21-120(a)(xliv)(B), W.S.1977, value includes total or partial satisfaction of a preexisting claim.

■ The security agreement between the Riverton Bank and the Walkers met the requirement for value, and we understand that there is no dispute about that. The security agreement specifically provided, as between the Walkers and the Riverton Bank, that all amounts owed to the bank, whether then existing or later advanced, were covered by the security agreement. The Cessna aircraft was described specifically as the collateral. Section 34-21-120(a)(iii), W.S.1977, sets forth a definition of agreement, which provides that the bargain of the parties may be found either in the language used or by implication from other circumstances. At the time the security agreement was made, the Walkers owed the Riverton Bank money on a previous promissory note made August 7, 1981. The agreement clearly manifests the intention of the parties that the aircraft served as collateral to secure the pre-existing debt. *Clovis National Bank v. Harmon,* 102 N.M. 166, 692 P.2d 1315 (1984). The Walkers had the rights of ownership in the Cessna airplane, and the security interest of the Riverton Bank attached when the security agreement was signed on April 6, 1984.

The security interest was perfected, according to law, on April 23, 1984 when the Riverton Bank filed the security agreement with the FAA. Title 49 U.S.C.App. § 1403 (1981) establishes a recording system with respect to conveyances of aircraft. This filing system was adopted in order to provide a central source of information from which notice of transactions could be obtained through an indexing system. See *Philko Aviation, Inc. v. Shacket,* 462 U.S. 406, 103 S.Ct. 2476, 76 L.Ed.2d 678 (1983). The function of this system is very similar to the notice provided through local filing systems for secured transactions. See *In re Gelking,* 754 F.2d 778 (8th Cir.1985), cert. denied sub nom. *Armstrong v. State Bank of Towner,* 473 U.S. 906, 105 S.Ct.

3529, 87 L.Ed.2d 653 (1985); *Bank of Oklahoma, City Plaza v. Martin,* 744 P.2d 218 (Okla.App.1987); Uniform Commercial Code (U.L.A.) § 9–302, Comment 8, 1972 Official Comment.

■ While, in this instance, the Riverton Bank recorded the security agreement, it was filed as a financing statement, as defined in § 34–21–951, W.S.1977. In a number of instances, this court has recognized the difference between a financing statement and a security agreement and has articulated the requirements and functions of a financing statement. See, e.g., *Landen v. Production Credit Association of Midlands,* 737 P.2d 1325 (Wyo.1987); *Sannerud v. First National Bank of Sheridan,* 708 P.2d 1236 (Wyo.1985); *Daly v. Shrimplin,* 610 P.2d 397 (Wyo.1980); *American National Bank of Riverton v. First National Bank of Lander,* 446 P.2d 968 (Wyo.1968). In *Shrimplin,* we emphasized the proposition that a financing statement is filed to give constructive notice of a security interest in property. We there noted that the formal requisites for financing statements are articulated in § 34–21–951, W.S.1977, and we quoted the following language with approval:

> " ' * * * The purpose of the filed statement or agreement is to give the minimum information necessary to put a searcher on inquiry. The section contemplates that the complete state of affairs will be learned only after such inquiry. * * * ' *Bank of America v. Bank of Nutley,* 94 N.J.Super. 220, 227 A.2d 535, 539 (1967)." *Shrimplin,* 610 P.2d at 404.

There is no question that the filed document in this section satisfied the requirements of § 34–21–951.

We again emphasize the notice theory with respect to financing statements. Prior decisions of this court are entirely consistent with the application of the Uniform Commercial Code as understood by its drafters and respected authorities in this area of the law. Uniform Commercial Code (U.L.A.) § 9–402, Comment 2, 1972 Official Comments, says in pertinent part:

> "This section adopts the system of 'notice filing' which proved successful under the Uniform Trust Receipts Act. What is required to be filed is not, as under chattel mortgage and conditional sales acts, the security agreement itself, but only a simple notice which may be filed before the security interest attaches or thereafter. The notice itself indicates merely that the secured party who has filed may have a security interest in the collateral described. Further inquiry from the parties concerned will be necessary to disclose the complete state of affairs. Section 9–208 provides a statutory procedure under which the secured party, at the debtor's request, may be required to make disclosure. Notice filing has proved to be of great use in financing transactions involving inventory, accounts and chattel paper, since it obviates the necessity of refiling on each of a series of transactions in a continuing arrangement where the collateral changes from day to day. Where other types of collateral are involved, the alternative procedure of filing a signed copy of the security agreement may prove to be the simplest solution. Sometimes more than one copy of a financing statement or of a security agreement used as a financing statement is needed for filing. In such a case the section permits use of a carbon copy or photographic copy of the paper, including signatures. "However, even in the case of filings that do not necessarily involve a series of transactions the financing statement is effective to encompass transactions under a security agreement not in existence and not contemplated at the time the notice was filed, if the description of collateral in the financing statement is broad enough to encompass them. Similarly, the financing statement is valid to cover after-acquired property and future advances under security agreements whether or not mentioned in the financing statement."

In his work on the U.C.C., Anderson says:

> "When a proper filing is made, third persons are presumed to have notice of and are subject to the provisions of the security agreement. A person is charged with

possessing the information that could have been discovered had he made the inquiry suggested by the filing.

\* \* \* \* \* \*

"The financing statement only gives notice that a security interest is claimed in certain described collateral. There is no requirement that the financing statement identify the obligation that is secured by the secured transaction nor to state the terms of such obligation. As there is no requirement that the financing statement identify the debt, there is no requirement that the financing statement set forth the amount of the debt, that future advances may be made, or the maximum amount of the debt.

"Because the financing statement does not identify any particular debt as underlying the secured transaction, the one financing statement may cover many successive obligations of the debtor with respect to the described collateral, without regard to the fact that different obligations are involved, or that there has been a refinancing of the obligation underlying the original secured transaction. Thus one filing of a financing statement may cover all secured transactions between the debtor and creditor and there is no requirement that a new financing statement be filed every time that a later secured transaction is entered into." 9 R. Anderson, Uniform Commercial Code, §§ 9–402:6, 9–402:22 at 448 and 462 (3d ed. 1985) (footnotes omitted).

■ Section 34–21–951, setting forth the requisites of a financing statement, does not require any statement of the amount secured. The same thing is true with respect to a security agreement. The law does not require that a security agreement recite the amount of the debt secured. Section 34–21–922, W.S.1977 (U.C.C. § 9–203); *Clovis*, 692 P.2d 1315; 8 R. Anderson, Uniform Commercial Code, § 9–203:27 at 676. These statutes contain minimal requirements with respect to the enforceability of and the attachment of the security interest and, if those requirements are met, nothing more need be done.

■ We find, in this instance, no question that the Walkers and the Riverton Bank intended that the Cessna aircraft serve as security for previously existing indebtedness. The intent of the parties controls, and that is true whatever the form or designation of the instrument might be. *Frantz v. First National Bank & Trust Company of Wyoming*, 687 P.2d 1159 (Wyo.1984). In this latter case, we said:

" \* \* \* A security agreement is effective according to its terms between the parties and subsequent purchasers if properly perfected by filing. The subsequent purchasers are presumed to have notice and are, therefore, subject to the provisions of the agreement." *Frantz* at 1162.

As the trial court perceptively noted, that is exactly the situation in this instance. The Cortez Bank was chargeable with this notice. The record does not disclose that it had actual notice of the prior security agreement in favor of the Riverton Bank. In its trial brief, the Cortez Bank argued that it had relied upon an FAA title search, but the stipulated facts do not include the fact of reliance. So far as the record evidence demonstrates, which is the only information this court has, the Cortez Bank had no information about the principal amount of $7,328.35 prior to making its loan to Walker. If the Cortez Bank had actual knowledge of the security agreement, then its duty to inquire is even more clear.

Under these circumstances, the Riverton Bank did everything that the law requires to perfect its security interest in the aircraft. The Cortez Bank had constructive, and perhaps actual, knowledge of the existence of a security interest in that aircraft. The theory of the Uniform Commercial Code is that, given that information, further inquiry is required in order to disclose the other facts that may be material to a subsequent purchaser or lender. Proper analysis and application of the Uniform Commercial Code leads to a conclusion that the judgment of the district court in this declaratory judgment suit be affirmed.

The judgment of the district court in this case is affirmed, and the opinion of this court filed in *First National Bank, Cortez v. First Interstate Bank, Riverton,* 758 P.2d 1026 (Wyo.1988), is vacated.

URBIGKIT, J., filed a dissenting opinion in which MACY, J., joined.

URBIGKIT, Justice, dissenting, with whom MACY, Justice, joins.

This reversal after rehearing, following a change in court membership, ignores a singular volume of cases and gives little credit to either stare decisis or stability. The majority in present opinion creates what they want the law to be, not what it generally by precedent has been or, as a general rule for efficiency and clarity in commercial enterprises, what it should be.

One lone New Mexico case, clearly distinguishable both in fact and logic which also has been superceded by a more recent New Mexico decision, provides the only support for this present majority decision which creates a posture of the law to ignore specificity in filed loan documents which would protect subsequent interest claimants. It is in the concept of adequate notice and identified debt that these anaconda-dragnet clauses have been for at least half a century viewed with suspicion and impressed with strictly confined application. This status is recognized in preparation and final drafting of the Uniform Commercial Code where a validation of a future claim to security coverage was included within carefully defined limits in operational status and no similar statutory provision was included for a pre-existing debt which most easily can be detailed to provide notice within the security document.

It is an interesting facet of communicative draftsmanship that the appellation of dragnet or anaconda clauses are not included in the majority opinion, although in text and annotation these defining words lead to the voluminous case law now ignored. The most recent case, authored by Chief Justice Rabinowitz of the Alaska Supreme Court, addresses directly this dragnet application of a security document. Within that evidentiary review and exhaustive case citation, the Alaska court repeats the determinative principle which was the basis of the prior majority opinion of this court, with both writers citing identical cases for authoritative support.

Many courts, however, have refused to rely solely on the language of the dragnet clause and instead have sought to determine the "true intent" of the parties. Decisions adopting this approach have pointed out that such clauses are usually "boiler-plate" in a document drafted by the lender, seldom the subject of negotiation, and often the debtor is unaware of its presence or implications. *See, e.g., Wong v. Beneficial Sav. and Loan Ass'n.,* 56 Cal.App.3d 286, 128 Cal. Rptr. 338, 342 (1976); *First Sec. Bank v. Shiew,* 609 P.2d 952, 957 (Utah 1980). These courts often opine that although dragnet clauses are not invalid, they will be carefully scrutinized and strictly construed; the courts express concern that the debtor may be caught unaware of the indebtedness that the agreement secures and consequently become the "economic serf" of the creditors. *See, e.g., Akamine & Sons, Ltd. v. American Sec. Bank,* 50 Hawaii 304, 440 P.2d 262, 267 (1968); *Emporia State Bank and Trust Co. v. Mounkes,* 214 Kan. 178, 519 P.2d 618 (1974) (quoting with approval *Akamine,* 440 P.2d at 267); *Shiew,* 609 P.2d at 955.

Courts have adopted various approaches to determine whether the nature of the "other debt" should bring it within the dragnet clause. Some have held that debts incurred prior to the security agreement ("antecedent debts") will not come within the dragnet clause unless such debts were specifically identified in the security agreement. *See, e.g., National Bank v. Blankenship,* 177 F.Supp. 667, 673–74 (E.D.Ark.1959), *aff'd sub nom. National Bank v. General Mills,* 283 F.2d 574 (8th Cir.1960) (applying Arkansas law); *Underwood v. Jarvis,* 358 So.2d 731, 735 (Ala.1978); *First v. Byrne,* 238 Iowa 712, 28 N.W.2d 509, 512 (1947); *First Nat'l Bank & Trust Co. v. Lygrisse,* 231 Kan. 595, 647 P.2d

1268, 1272 (1982). A key rationale underlying these holdings is that since the antecedent debt is already owed by the borrower to the lender, the parties would have had no good reason not to identify it in the subsequent security instrument if they had truly intended the deed of trust or mortgage to cover it. *Blankenship,* 177 F.Supp. at 673–74; *Underwood,* 358 So.2d at 735; *Byrne,* 28 N.W. 2d at 512. Several decisions have modified this rule by holding that if the parties expressly agree in a subsequent instrument that a security agreement containing the dragnet clause extends to an antecedent debt specifically referred to in the subsequent instrument then the dragnet clause will apply to the antecedent debt. *Kamaole Resort Twenty–One v. Ficke Hawaiian Investments,* 60 Hawaii 413, 591 P.2d 104, 112 (1979); *Lygrisse,* 647 P.2d at 1273.

\* \* \* \* \* \*

Our study of the foregoing authorities leads us to reject an approach which enforces dragnet clauses uncritically. Here we conclude that the dragnet clause contained in NBA's second deed of trust on Seven Mile North Yard does not encompass any of JMI and LPCC's approximately $2.7 million of antecedent debt to NBA.

In reaching this conclusion, we are persuaded by those authorities which hold that antecedent debts will not be included within the scope of a dragnet clause unless such debts are specifically identified in the security agreement. Identification and incorporation of such debts in the security agreement will provide accurate and accessible notice as to the extent of indebtedness secured by the subject property not only to the parties to the agreement, but also to all those who subsequently deal with the parties and the property. Of controlling significance is the fact that this approach will thus furnish protection for junior lienholders. *Lundgren v. National Bank of Alaska,* 756 P.2d 270, 277–78 (Alaska 1987).

This principle of reliable notice is a basic justification for recording and filing statutes where an efficient lending industry can examine and determine limits of utilization of security coverage by reading the filed documents and security instruments. These general principles have developed both for real estate and chattel financing and many of the cases are produced by security conflicts as a question of lien priority.[1] See differentiation of classes of cases in prior opinion, *First Nat. Bank, Cortez, Colo. v. First Interstate Bank, Riverton,* 758 P.2d 1026, 1030 (Wyo.1988). One major class is established by the U.C. C. chattel financing future advance provision, U.C.C. § 9–204 (W.S. 34–21–923(c)), which states that "[o]bligations covered by a security agreement may include future advances or other value whether or not the advances or value are given pursuant to commitment." Generally, this clause is considered to have confirmed prior case law that a discernible difference in application between the statutory provision for chattel financing and real estate applications does not exist. It is noteworthy that the one dragnet case actually cited by the majority, *Clovis Nat. Bank v. Harmon,* 102 N.M. 166, 692 P.2d 1315 (1984), did involve a real estate transaction.

---

1. Dragnet clause controversies between claimant lenders are equally included within the total number of lawsuits which attack these clauses. Examples include: *United States v. Fahrenkamp,* 312 F.2d 627 (8th Cir.1963); *Feldman v. Philadelphia Nat. Bank,* 408 F.Supp. 24 (E.D.Pa. 1976); *Marine Nat. Bank v. Airco, Inc.,* 389 F.Supp. 231 (W.D.Pa.1975); *National Bank of Eastern Ark. v. Blankenship,* 177 F.Supp. 667 (E.D.Ark.1959), *aff'd,* 283 F.2d 574 (8th Cir. 1960); *Lundgren,* 756 P.2d 270; *Security Bank v. First Nat. Bank,* 263 Ark. 525, 565 S.W.2d 623 (1978); *First Nat. Bank of Corning v. Corning Bank & Trust Co.,* 168 Ark. 17, 268 S.W. 606 (1925); *Kamaole Resort Twenty–One v. Ficke Hawaiian Investments, Inc.,* 60 Haw. 413, 591 P.2d 104 (1979); *Akamine and Sons, Limited v. American Sec. Bank,* 50 Haw. 304, 50 Haw. 368, 440 P.2d 262 (1968); *Ruidoso State Bank v. Castle,* 105 N.M. 158, 730 P.2d 461 (1986); *Clovis Nat. Bank v. Harmon,* 102 N.M. 166, 692 P.2d 1315 (1984); *New Mexico Bank & Trust Co. v. Lucas Bros.,* 92 N.M. 2, 582 P.2d 379 (1978); *Farmers Nat. Bank of Cherokee v. De Fever,* 177 Okl. 561, 61 P.2d 245 (1936); *First Nat. Bank of Ardmore v. Gillam,* 134 Okl. 237, 273 P. 261 (1927); and *In re Grizaffi,* 23 B.R. 137 (Colo. 1982).

Not only was *Clovis National Bank* a real estate transaction, it was also a trial concluded case with the principal appellate issue of the substantial evidence rule which was sufficient to support a trial court factual finding. Annotations reveal that except for a succeeding case where *Clovis National Bank* was put in its proper perspective in New Mexico law, the case has since been cited only in support of that substantial evidence rule and was never used as authority on dragnet financing in any case, whether in New Mexico or any other jurisdiction *until this case.*

The reason for its limitation in precedential value is easily perceived in examining the more recent case of *Ruidoso State Bank v. Castle*, 105 N.M. 158, 730 P.2d 461 (1986), where the New Mexico court was called to more specifically consider the dragnet provision in lending documentation. The question in *Ruidoso State Bank* was

> whether a mortgage containing a "dragnet clause" covers preexisting debts to the lender in all cases, whether or not those debts are related to the purpose of the loan for which the mortgage is obtained, to give the lender in a foreclosure proceeding a priority position as to those debts over judgments obtained by other creditors before foreclosure. In the circumstances of this case, we hold it does not and we affirm the trial court.

*Id.* 730 P.2d at 461. *See likewise, In re Bass*, 44 B.R. 113 (N.M.1984), which applied New Mexico law and denied application to the earlier existent but non-referenced differentiated purpose loan.

In *Ruidoso State Bank*, 730 P.2d 461, the factual situation is remarkably similar to the present case with the exception that the succeeding liens were obtained by judgment rather than by new loans to the debtor. In March 1982, debtor gave Ruidoso State Bank note one in the amount of $10,100 secured by chattel security on a 20–ton crane. In June, he gave a second promissory note for $4,334.64 secured by a mortgage on a vehicle. A third note was executed in July as a real estate mortgage and a fourth mortgage in September, which

contained a dragnet clause for both future advances and antecedent debts in each real estate mortgage. The note covered an additional $12,000. In December, a second creditor obtained a money judgment against the debtor. Following thereafter in 1983, the debtor executed a further note in favor of the bank of $6,000 as a renewal note of note three, and in November of the same year, the bank obtained a deficiency judgment on the chattel financing transactions, notes one and two, in the amount of $6,032.12. The factual issue then presented was whether the second creditor's judgment lien of December 1982 provided a higher priority than the dragnet application of the defaulted payments on notes one and two as each was to be impressed upon equity value beyond the real estate mortgage stated amounts. In trial court, and as affirmed on appeal, Ruidoso State Bank lost and its dragnet clause was not accorded function sufficiency to provide a priority superior to the intervening judgment liens. There, as in this case, the debtor disappeared from the litigative proceedings by default.

The New Mexico court then directly related the *Ruidoso State Bank*, 730 P.2d 461 decision to the prior case, *Clovis National Bank*, 692 P.2d 1315:

> We think the trial court was correct, however, in declining to read *Harmon* [692 P.2d 1315] as establishing as a matter of law that any holder of a mortgage having a dragnet provision has, automatically, with respect to all preexisting and future obligations, a priority date as of the date of the mortgage.
>
> * * * In *Harmon*, then, this Court, in its appellate role, simply concluded that based on the record before it the trial judge had not erred in deciding that the dragnet clause contained in the real estate mortgage secured other notes involved in that particular case. Having said here, however, that dragnet clauses do not, as a matter of law, secure all debts between parties, we must then determine if substantial evidence supports the trial court's decision.
>
> Dragnet clauses which purport to secure all debts, past, present, and future,

between parties to a security agreement generally are disfavored and thus strictly construed. *Uransky v. First Federal Savings & Loan Association* [684 F.2d 750 (11th Cir.1982) ]. Aside from the actual language of the provision, construction should focus on the intent of the parties as evidenced by the circumstances surrounding the mortgage and the nexus between the mortgage and the notes involved.

*Ruidoso State Bank,* 730 P.2d at 463. The New Mexico Supreme Court thus affirmed the trial court decision that the dragnet clause was ineffective to affix priority on the real estate mortgage for the earlier chattel loans. By judgment which gave priority to the intervening lien claimants, the bank was given third priority as to its remaining balances on the first two notes as superior only to other non-participating creditors. A comprehensive examination as similar precedent is found in *Farmers & Mechanics Bank v. Davies,* 97 Ill.App.3d 195, 52 Ill.Dec. 655, 422 N.E.2d 864 (1981).

It is in this examination now made by the current majority which is directly contrary to the general rule stated by the most recent New Mexico case as a fact and circumstance test to establish nexus, where my critical disagreement is derived. This Wyoming summary judgment cannot be justified on that precedent, *Ruidoso State Bank,* 730 P.2d 461, nor any other directly related authority. *See Lundgren,* 756 P.2d 270; *Freese Leasing, Inc. v. Union Trust & Sav. Bank, Stanwood,* 253 N.W.2d 921 (Iowa 1977); and *Canal Nat. Bank v. Becker,* 431 A.2d 71 (Me.1981).

In present appeal, this debtor had a large oil drilling operation loan in the initial amount of approximately $93,000 as subsequently renewed for approximately $77,605.63 which was secured by the equipment of the business enterprise described as "rigs." The second loan of $7,328.35 as made with the security of the airplane, had no discernible relationship with the earlier business operating loan. It was with purpose unstated, secured by totally different property, namely the airplane which, unless recently purchased by the debtor, had apparently not been previously burdened by chattel financing. It was out of this relatively small mortgage that the security document form language of a dragnet clause provision was incorporated.

There is no evidence in the record that the borrowers realized the effect of the dragnet clause so that they were thereafter at best to commit a criminal fraud when they gave another lien on the same airplane to the First National Bank of Cortez contrary to the apparent assumption of both that lender and the same borrowers that the airplane was only indebted for the $7,328.35 loan and not the underlying pre-existing earlier operating loan of a singularly greater amount of $77,605.63. We are then here, as was the case in *Ruidoso State Bank,* 730 P.2d 461, provided no evidence sufficient to meet the strict scrutiny test required generally by the cases and specifically by the New Mexico court. *See likewise, New Mexico Bank and Trust Co. v. Lucas Bros.,* 92 N.M. 2, 582 P.2d 379 (1978), where it was determined that actual notice was the determinative factor. Future advances were involved with the statutory future advance maximum coverage provision then controlling.

For comparable authority to *Ruidoso State Bank,* 730 P.2d 461, see *Dixie Ag Supply, Inc. v. Nelson,* 500 So.2d 1036 (Ala.1986), which defines, as a test for dragnet clause effectiveness, that the loan document itemize the existing indebtedness by clear and unequivocal terms and references that include a specific and identifiable antecedent debt in order to extend the coverage of the security agreement to that antecedent debt. In *Dixie Ag Supply, Inc.,* the antecedent debt was specifically identified and the clause was consequently given validation to effectuate debt coverage against the designated security. See identification in mortgage test as applied in *Badger State Agri–Credit & Realty, Inc. v. Lubahn,* 122 Wis.2d 718, 365 N.W.2d 616 (1985). The burden of proof for specificity of identification of the debt to be covered intended within the loan documents rests upon the lender claimant. *Wong v. Beneficial Sav. and Loan Ass'n,* 56 Cal.App.3d 286, 128 Cal.Rptr. 338 (1976); *Kamaole*

*Resort Twenty–One v. Ficke Hawaiian Investments, Inc.,* 60 Haw. 413, 591 P.2d 104 (1979); *Capocasa v. First Nat. Bank of Stevens Point,* 36 Wis.2d 714, 154 N.W.2d 271 (1967).

Lacking that specificity of the amount intended to be dragged forward by the dragnet to be thrust under the security umbrella, I dissent from this reversal upon rehearing to put Wyoming in a class of the only jurisdiction which adopts a totality rule of validation for dragnet-anaconda clause application. More serious problems from this clutch and thrust aptitude will develop causing controversy among lenders, all of whom in initial relationships probably act in good faith in a particular transaction.

There is nothing cited as authority by the majority which lends strength as precedent to what is basically an undirected deviation of dragnet legal application. Surprisingly, the majority does not cite the extensive literature or distinguish the cases enumerated in detail in prior writings or specifically the two most recent cases of *Ruidoso State Bank,* 730 P.2d 461 and *Lundgren,* 756 P.2d 270. Those two can be joined by a third of interest, which is also not cited, *Decorah State Bank v. Zidlicky,* 426 N.W. 2d 388, 390 (Iowa 1988) which, although discussing a future advance application, relates:

> II. Future advances clauses are valid but courts look upon them with a definite lack of enthusiasm. We have adopted the following standard for ascertaining whether a future advances clause (also known as a dragnet clause) includes a particular debt:
>
> > [I]n the absence of clear, supportive evidence of a contrary intention a mortgage containing a dragnet type clause will not be extended to cover future advances unless the advances are of the same kind and quality or relate to the same transaction or series of transactions as the principal obligation secured or unless the document evidencing the subsequent advance refers to the mortgage as providing security therefor.

*Freese Leasing,* 253 N.W.2d at 927 (quoting *Emporia Bank and Trust Co. v. Mounkes,* 214 Kan. 178, 184, 519 P.2d 618, 623 (1974)). The *Freese Leasing* tests are alternative tests. *Hawkeye Bank & Trust Co. v. Michel,* 373 N.W.2d 127, 130 (Iowa 1985).

Dragnet clauses are valid but are not favored by the law. *Farmers Trust & Sav. Bank v. Manning,* 311 N.W.2d 285, 289 (Iowa 1981). They are thus strictly construed against the mortgagee.

*Cf. Union Nat. Bank of Little Rock v. First State Bank & Trust Co. of Conway,* 16 Ark.App. 116, 697 S.W.2d 940, 941–42 (1985), which notes the

> well-settled rule that a mortgage given to secure a specific debt will not be extended to cover debts subsequently incurred unless they are of the same class or are so related to the primary debt secured that the assent of the mortgagor will be inferred. The purpose for such a requirement is to prevent the extension of a lien by the use of general terms to debts which the debtor did not contemplate.

There is a further thesis as argued by First National Bank of Cortez in this case justifying retention of our first decision. If the document which provides the notice of indebtedness contains a secured amount total, that document should accurately reflect the totality of indebtedness and not exclude prior amounts which would later be claimed to be brought within its coverage. This is the seriously misleading prohibition of the security documents. *See In re South Atlantic Packers Ass'n, Inc.,* 30 B.R. 836, 838 (S.C.1983) and 9 Hawkland, Lord & Lewis, UCC Series § 9–402:14 at 410 (1986). The financing statement or document of notice is misleading if the effect is that a potential creditor could have been misled. *In re Pacific Trencher & Equipment, Inc.,* 735 F.2d 362, 364 (9th Cir.1984); *In re HGS Technical Associates, Inc.,* 14 UCC Rep.Serv. 237, 245 (1972), *aff'd,* 14 UCC Rep.Serv. 247 (E.D. Tenn.1973). This argument also has logic in context that if stated as a debt coverage,

## 656

it should include the total amount intended to be consequently secured.

The seriously misleading thesis as addressed by a singular number of cases by First National Bank of Cortez in their rehearing brief is related to the conjecture of the majority that where a self-standing financing statement is used, then no amount is stated. In first analysis, it is true that if no amount is stated, it is not misleading, but that is not the case because the documents here clearly reflect a filed combination form which included a stated amount of only $7,328.35. *See First Agri Services, Inc. v. Kahl,* 129 Wis.2d 464, 385 N.W.2d 191, 194 (1986).

There is another disability in the logic of the majority in application of the financing statement requirements to the aircraft filing standard with the Federal Aviation Authority. Nothing is found to reveal that financing statements *can* be filed with the FAA and, certainly in this case, a self-standing simple financing statement was not filed. The federal statute, 49 U.S.C.A. App. 1403(a)(1) (West 1976), provides: "Any conveyance which affects the title to, or any interest in, any civil aircraft of the United States." Recording of Aircraft Title and Security Documents, 14 C.F.R. § 49.17(a) (1988) defines:

> "Conveyance" means a bill of sale, contract of conditional sale, mortgage, assignment of mortgage, or other instrument affecting title to, or interest in, property.

Lacking citation of authority by litigants or a recitation of case law by the majority, there is only one case found on the subject which accurately recognizes that a financing statement is not a conveyance and apparently is not a fileable document within the FAA registration system at Oklahoma City, Oklahoma. In *Feldman v. Philadelphia Nat. Bank,* 408 F.Supp. 24, 35 (E.D. Pa.1976), the court recognized that Article 9 of the U.C.C.

> adopts a system of "notice filing" whereby the only document filed is a financing statement which is no more than a "simple notice" indicating "merely that the secured party who has filed may have a security interest in the collateral described." UCC § 9–402, Comment 2, 12A P.S. § 9–402. * * *.

> * * * The Federal Aviation Act does not adopt a notice filing system with respect to conveyances, but instead requires that the instrument of conveyance through which the party claims the interest must itself be filed with the Administrator for recording. The Act explicitly states that an instrument is invalid as to third parties without actual notice unless that *instrument* is on file with the Administrator. [Emphasis in original.]

Cf. *Landen v. Production Credit Ass'n of Midlands,* 737 P.2d 1325 (Wyo.1987) and *Stannerud v. First Nat. Bank of Sheridan,* 708 P.2d 1236 (Wyo.1985).

Whatever kind of document may be fileable with the county clerk does not provide a substitute for proper filing of a recordable instrument with the FAA pursuant to the federal statute. *State Securities Co. v. Aviation Enterprises, Inc.,* 355 F.2d 225 (10th Cir.1966); *In re Pegasus Intern. Travel Club,* 15 B.R. 842 (Bankr.M.D.Pa. 1981).

I do not have any significant disagreement with the force and effect of the authorities cited by the majority except *Clovis National Bank.* However, these authorities really do not have anything to do with dragnet clause finance case law and consequently provide no authority for the arbitrary posture adopted in opinion which disregards a rather consistent national development in the law for more than fifty years. Annotation, *Debts Included in Provision of Mortgage Purporting to Cover All Future and Existing Debts (Dragnet Clause)—Modern Status,* 3 A.L.R.4th 690 (1981). See *National Bank of Eastern Ark. v. Blankenship,* 177 F.Supp. 667 (E.D. Ark.1959), *aff'd,* 283 F.2d 574 (8th Cir. 1960); *Hendrickson v. Farmers' Bank & Trust Co.,* 189 Ark. 423, 73 S.W.2d 725 (1934); *First Nat. Bank of Corning v. Corning Bank & Trust Co.,* 168 Ark. 17, 268 S.W. 606 (1925); *Skinner v. Elliot,* 17 Ga.App. 511, 87 S.E. 759 (1916); *Freese Leasing, Inc.,* 253 N.W.2d 921; *Sowder v. Lawrence,* 129 Kan. 135, 281 P. 921 (1929);

*Farmers Nat. Bank of Cherokee v. De Fever*, 177 Okl. 561, 61 P.2d 245 (1936); *First Nat. Bank of Ardmore v. Gillam*, 134 Okl. 237, 273 P. 261 (1927); and *McCollum v. Braddock Trust Co.*, 330 Pa. 293, 198 A. 803 (1938). More recent cases include *Lundgren*, 756 P.2d 270; *Farmers & Mechanics Bank*, 52 Ill.Dec. 655, 422 N.E.2d 864; *Ruidoso State Bank*, 730 P.2d 461; *First Sec. Bank of Utah v. Shiew*, 609 P.2d 952 (Utah 1980); and *Badger State Agri–Credit & Realty, Inc.*, 365 N.W.2d 616. *See also* G. Nelson and D. Whitman, Real Estate Finance Law § 12.8 (2d ed. 1985).

Any hypothetical discussion that a financing statement, if separately used, need not include an amount secured has no relevance to the facts of this case where the filed document designated as a consumer's security and pledge agreement stated a principle amount of $7,328.35. This is precisely the amount shown from the record which was revealed in the title search with the Federal Aviation Authority. The argument provides no support for contention about what would be the case if the lender were to use a nondesignated amount financing statement which might be possible if the property, as different from this case, was not an airplane. The defined amount as secured was $7,328.35 and not plus $77,-605.63 as arrived from earlier separately placed loan transaction. Consequently, *WYHY Federal Credit Union v. Burchell*, 643 P.2d 471 (Wyo.1982) is unrelated as involving an unsecured security agreement form. The accounts receivable financing as also involving an unfiled subsequent creditor claim in *Daly v. Shrimplin*, 610 P.2d 397 (Wyo.1980) is likewise uninformative in this factual situation for a prior indebtedness dragnet clause. The application of a lien to chattel proceeds is likewise dissimilar in *Frantz v. First Nat. Bank & Trust Co. of Wyoming*, 687 P.2d 1159 (Wyo.1984).

The issue raised in *In re Gelking*, 754 F.2d 778 (8th Cir.), *cert. denied*, 473 U.S. 906, 105 S.Ct. 3529, 87 L.Ed.2d 653 (1985) and *Bank of Oklahoma, City Plaza v. Martin*, 744 P.2d 218 (Okl.App.1987) presented priority of filing with the FAA which is a question of federal law. *Philko Aviation, Inc. v. Shacket*, 462 U.S. 406, 103 S.Ct. 2476, 76 L.Ed.2d 678 (1983) and not the effect of the particular document which, by 49 U.S.C.App. § 1406, is controlled by state law. *Matter of Gary Aircraft Corp.*, 681 F.2d 365, 368–69 (5th Cir. 1982), *cert. denied*, 462 U.S. 1131, 103 S.Ct. 3110, 77 L.Ed.2d 1366 (1983). Consequently, the majority's citation and argument reaches no issue properly presented here.

In considerable detail in rehearing brief, First Interstate Bank questions what can be done since it conducted the foreclosure "at private sale, in bulk, for the total sum of $70,000." Within the uninformative record, there is nothing to suggest that the sale was conducted legally in accord with the U.C.C. after proper notice but, in any event, the risk of an in bulk private sale sets its own responsibilities. This is particularly true since unquestionably, First National Bank of Cortez had a lien interest in the airplane with notice given and the only question was priority. *See* W.S. 34–21–963(c). *See Stephens v. Sheridan Public Emp. Federal Credit Union*, 594 P.2d 473 (Wyo.1979) and *Whirlybirds Leasing Co. v. Aerospatiale Helicopter Corp.*, 749 S.W.2d 915 (Tex.App.1988). *Cf. Durdahl v. Bank of Casper*, 718 P.2d 23 (Wyo.1986) and Annotation, *Sufficiency of Secured Party's Notification of Sale or Other Intended Disposition of Collateral Under UCC § 9–504(3)*, 11 A.L.R.4th 241 (1982). Actually, no particular problem would have been created since upon remand the litigants would have determined by proper evidence what the value of the chattel property was so that First Interstate Bank would have been chargeable for the value of the property after deduction of its priority claim of $7,328.35 or balance thereof remaining at sale date with accrued interest and prorated costs of foreclosure sale. If the lender selling at private sale did not get proper value, it only constitutes the risk elected by conducting the private sale in bulk. This abridged record for an issue not briefed until rehearing does not justify (or permit) adequate review of the validity of initial sale and its effect before or now

after reversal of initial decision on rehearing. *ABC Builders, Inc. v. Phillips,* 632 P.2d 925 (Wyo.1981). *See Villella Enterprises, Inc. v. Young,* 108 N.M. 33, 766 P.2d 293 (1988).

Realistically, little benefit would be derived in a repetition in further writing in this opinion as to the authorities and principles generally followed in the extensive case law as previously recited in detail in the prior opinion of *First Nat. Bank, Cortez, Colo.,* 758 P.2d 1026 or to be found in *Ruidoso State Bank,* 730 P.2d 461 and *Lundgren,* 756 P.2d 270. The practical result of this majority's decision is to freeze out any additional security value of a borrower's assets after his first loan where partial utilization has occurred. Consequently, this majority, in an unjustified decision which makes new law, further limits credit to the Wyoming borrower.

In re-examination, I remain even more firmly convinced that the first decision was both legally persuasive and formally implanted by near unanimous precedent. Consequently, I dissent from reversal on rehearing.