**In re L.D. McMULLAN and Nila McMullan, Debtors.**

**NATIONAL BANK OF COMMERCE OF EL DORADO, Plaintiff,**

**v.**

**L.D. McMULLAN and Nila Owens McMullan, Defendants.**

**Bankruptcy No. 94–11228M.**
**Adv. No. 94–1516.**

United States Bankruptcy Court,
W.D. Arkansas,
El Dorado Division.

April 18, 1996.

Stephen L. Gershner, Little Rock, AR, for Defendants.

Charles R. Camp, Michael Massey and Herman Ivester, Little Rock, AR, for Plaintiff.

## MEMORANDUM OPINION

JAMES G. MIXON, Chief Judge.

On December 20, 1994, L.D. McMullan and Nila McMullan filed a voluntary petition for relief under the provisions of Chapter 11 of the United States Bankruptcy Code. On the same day the McMullans removed this foreclosure action pending in state court to this Court pursuant to 28 U.S.C. § 1452 (1994). A trial on the merits of the foreclosure action was held on May 15, 1995, after which the matter was taken under advisement.

The proceeding before the Court is a core proceeding in accordance with 28 U.S.C. § 157(b)(2)(B) (1994), and the Court has jurisdiction to enter a final judgment in the case. The following shall constitute the Court's findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052.

### BACKGROUND

From February 1, 1982, through December 14, 1988, L.D. and Nila McMullan and National Bank of Commerce (NBC) engaged in a series of complex business loan transactions. NBC made several loans to the McMullans that were secured by real estate located in Union County, Arkansas; oil leases located in Louisiana; and various types of oil field equipment also located in Louisiana.

In connection with the loans to the McMullans, NBC currently holds four promissory notes consisting of the following:

(1) Note numbered 87761 dated May 7, 1986, in the original principal sum of $233,400.00, executed by L.D. and Nila McMullan,

(2) Note numbered 87762 dated May 7, 1986, in the original principal sum of $206,550.00, executed by L.D. and Nila McMullan,

(3) Note numbered 89334 dated December 17, 1986, in the original principal sum of $27,484.64, executed by L.D. and Nila McMullan, and

(4) Note numbered 95049 dated December 14, 1988, in the original principal sum of $150,000.00, executed by L.D. and Nila McMullan and Ed and Ailene Cook.

The McMullans' liability on these four notes evolved from transactions with the

bank that began in early 1982 when NBC loaned the McMullans $200,000.00 to purchase a one-thirteenth working interest in the "Manorado oil properties" located in Sabine, Winn, and Red River Parishes, Louisiana. In early 1986 the price of oil had decreased and operating expenses of the oil fields had increased. The McMullans were unable to make the payments due on the notes, and NBC became concerned. The bank agreed to extend the due dates of the note payments if the McMullans would convey additional collateral to the bank. The McMullans agreed and conveyed a mortgage on the their interest in oil production in Sabine and Union Parishes and a mortgage in the McMullans' one-half interest in an El Dorado office building.

On May 7, 1986, NBC loaned the McMullans an additional $206,550.00 to pay off an indebtedness related to leases in a different oil field serviced by the McBead Drilling Company. The May 7, 1986, note described the collateral securing the $206,550.00 note as including, "Real Estate Mortgage * Oil Prod. Mtg. dated 9–12–84 & 5–7–86." Pl.'s Ex. 29. The referenced mortgages refer to the McMullans' interest in oil and gas leases, leasehold equipment, and oil production in Webster Parish, Louisiana, known as the Bobby Slack properties, and in an office building located in El Dorado, Arkansas.

On May 7, 1986, the McMullans executed a note in favor of NBC in the principal sum of $233,400.00. This note was secured by a mortgage on the McMullans' interest in oil production in Sabine and Union Parishes and in the McMullans' one-half interest in the El Dorado office building. The May 7, 1986, mortgages were recorded on May 12, 1986. In December 1986, NBC loaned the McMullans an additional $27,484.64 evidenced by note numbered 89334 to make the payments due on the two existing oil field-related notes.

L.D. McMullan testified that in June 1987 he informed James Cook, president of NBC, that the McMullans were reluctantly contemplating bankruptcy. L.D. McMullan recalled that Cook stated, "Well, [Nila McMullan does not] need to file bankruptcy. The bank would never take any action against her." Record at 244. Following that discussion, on June 17, 1987, L.D. McMullan filed an individual voluntary petition for relief under the provisions of Chapter 7 of the United States Bankruptcy Code.

The Chapter 7 schedules listed NBC as a creditor holding three claims of $232,270.00, $27,000.00, and $225,500.00. The claims were characterized as partially secured to the extent of $125,000.00. The security was identified on the schedules as "oil prod, Maney, LA," "oil prod. Sarepta, LA; also includes 50% interest from 1971 in office building." L.D. McMullan was granted a discharge in the Chapter 7 proceeding on September 8, 1988, and the case was closed on March 25, 1992.

In December 1988, L.D. McMullan approached James Cook to secure an additional loan from NBC to improve the office building jointly owned by L.D. and Nila McMullan and Ed and Ailene Cook. After negotiations, which will be discussed below in more detail, Cook, on behalf of NBC, agreed to make the loan. On December 14, 1988, L.D. and Nila McMullan and Ed and Ailene Cook executed note numbered 95049 in the principal sum of $150,000.00, which was secured by a mortgage on the office building. The mortgage was executed by L.D. and Nila McMullan and Ed and Ailene Cook and recorded on December 16, 1988.

On October 12, 1989, the Court entered an order in L.D. McMullan's Chapter 7 proceeding granting NBC's motion to abandon property from the estate. The order, which was prepared by counsel for NBC, stated:

The debtor, L.D. McMullan, is indebted to NBC in the amount of $453,877.54 as of September 13, 1989. The debt is secured by a Mortgage on oil properties in Sabine and Winn Parishes, Louisiana, which Mortgage was duly recorded on February 17, 1983, bearing Registration No. 265644 in Sabine Parish, Louisiana. Additionally, the debt to NBC is secured by a Mortgage dated May 7, 1986, recorded on May 12, 1986, in Book 1648 at Pages 598 and 604 in the records of Union County, Arkansas, which Mortgage covers Lots 43, 45, 47 and 49 of Block 5 in the North Washington Addition to the City of El Dorado, Union County, Arkansas, and by a Mortgage on certain oil and gas leases in Webster Parish, Louisiana, which was filed in Webster Parish on September 17, 1984, No. 318241.

The debtor has an undivided one-half interest in the real estate located in Union County, Arkansas, as described in Mortgage recorded in Book 1648, Page 598 and Page 604 and has an undivided working interest in the oil leases in Sabine Parish, Louisiana, and of .1833335 in the Webster Parish leases. The security for the loans made by NBC to the debtor is now of substantially less value than the balance owed to NBC. The debtor has no equity in the property. The property should be abandoned by the trustee in this case as having no value to the estate.

Pl.'s Ex. 47.

On November 13, 1992, thirty-six months after NBC obtained the order of abandonment in the bankruptcy proceeding, it filed a petition in the chancery court of Union County, Arkansas, to foreclose its security interests and mortgage liens allegedly existing in personal and real property located in Louisiana and Arkansas.[1] NBC sought to foreclose L.D. McMullan's interest in the collateral, but did not seek a personal judgment against him because of the Chapter 7 discharge. NBC also sought to foreclose Nila McMullan's interest in the collateral and did seek a personal judgment against her in the amount of $565,411.75, plus attorney's fees. The foreclosure action was removed to this Court on December 20, 1994, and trial on the merits was held on May 15, 1995.

■ In order to be entitled to a judgment, NBC must prove that the debt has matured and is unpaid. *Rawhide Farms, Inc. v. Darby*, 267 Ark. 776, 780, 589 S.W.2d 210, 212 (Ct.App.1979). NBC has established the amounts due on the notes as follows:

Note 87761
| | |
|---|---|
| Nila McMullan | $298,853.36 |
| In Rem | 232,270.00 |

Note 87762
| | |
|---|---|
| Nila McMullan | $264,663.01 |
| In Rem | 205,550.00 |

Note 89334
| | |
|---|---|
| Nila McMullan | $ 46,277.27 |
| In Rem | 27,484.64 |

Note 95049
| | |
|---|---|
| L.D. and Nila McMullan | $ 29,248.36 |

NBC has also established that all the notes are in default as to note payments and therefore matured under a standard acceleration clause, with the exception of note numbered 95049.

■ Although note numbered 95049 is not in default as to note payments, it may also be accelerated because all of the notes contain a clause that makes a default on any obligation to NBC a default of each note. This clause provides, in substance, that if the McMullans default on any obligation required by the notes or mortgages, NBC may accelerate the due date of all payments due under all notes and demand immediate payment in full. The validity of an acceleration clause has been upheld. *Mitchell v. Federal Land Bank of St. Louis*, 206 Ark. 253, 261, 174 S.W.2d 671, 676 (1943). The notes are to be read together with the mortgages, and NBC is entitled to accelerate the payments due under all the notes, including note numbered 95049. *Rawhide Farms, Inc. v. Darby*, 267 Ark. 776, 780, 589 S.W.2d 210, 212 (Ct.App.1979). Therefore, NBC has established a prima facie case for judgment for foreclosure on all the notes.

### Defenses

The McMullans raise five defenses in opposition to NBC's allegations. First, the McMullans argue that the parties reached an accord and satisfaction in regard to the debt owed to NBC, thereby extinguishing their liability to the bank. Second, the McMullans assert that they did not sign all the documents involved in the transactions. Specifically, Nila McMullan asserts that she did not execute note numbered 87761 and 87762, nor the May 7, 1986, mortgage on the office building. L.D. McMullan also asserts that he did not execute the May 7, 1986, mortgage on the office building. Third, the McMullans contend that the "other indebtedness" clauses contained in mortgages they previously conveyed to NBC do not grant NBC a mort-

---

1. The defendants apparently did not raise by responsive pleading in the chancery court the jurisdictional issues related to the power of the chancery court of Union County, Arkansas, to foreclose liens and security interests in real and personal property located in the state of Louisiana. *See* 59 C.J.S. *Mortgages* § 615 (1949).

gage in the El Dorado office building to secure notes numbered 87761, 87762 and 89334. Fourth, Nila McMullan argues that she has been discharged from personal liability because NBC made a disposition of certain collateral consisting of personal property without notice to her as required by Ark. Code Ann. § 4–9–504 (Michie 1991). Fifth, Nila McMullan argues that requiring her to execute the notes and mortgages (with the exception of the December 1988 note and mortgage for $150,000.00) violated the Equal Credit Opportunity Act, 15 U.S.C. § 1691 (1994), because she had no ownership interest in any of the oil leases or personal property and the loan proceeds were disbursed solely to her husband. Each of the McMullans' defenses will be discussed separately below.

### Accord and Satisfaction

■ The McMullans have the burden of establishing the affirmative defense of accord and satisfaction. Fed.R.Bankr.P. 7008(a) (incorporating by reference Fed.R.Civ.P. 8(c)). They must prove that the parties reached an accord and that full satisfaction of the accord occurred.

■ An accord is reached when one party agrees to pay and the other party agrees to receive "a different consideration or a sum less than the amount to which the latter is or considers himself entitled." *Dyke Indus., Inc. v. Waldrop,* 16 Ark.App. 125, 127, 697 S.W.2d 936, 937 (1985) (citing *Jewell v. General Air Conditioning Corp.,* 226 Ark. 304, 308, 289 S.W.2d 881, 883 (1956)). Stated differently, the parties must have an understanding that the payment of the smaller sum will discharge the whole debt. *Fort Smith Serv. Fin. v. Parrish,* 302 Ark. 299, 304, 789 S.W.2d 723, 725 (1990) (citing *Jewell,* 226 Ark. at 308, 289 S.W.2d at 883).

■ For satisfaction to exist, "nothing short of actual performance meaning thereby performance accepted will suffice.... Accord and part performance do not constitute satisfaction. It is merely executory so long as to its terms something remains." *General Air Conditioning Corp. v. Fullerton,* 227 Ark. 278, 282, 298 S.W.2d 61, 64 (1957) (quoting *Lyle v. Federal Union Ins. Co.,* 206 Ark.

1123, 1129, 178 S.W.2d 651, 654 (1944)). Thus, part performance is not satisfaction, regardless of whether the failure to perform is the fault of either party. *North State Fire Ins. Co. v. Dillard,* 88 Ark. 473, 476, 115 S.W. 154, 155 (1908).

The McMullans argue that two separate accord and satisfactions occurred, either of which absolve them of further liability to NBC. The first concerns the December 1988 loan transaction in the sum of $150,000.00, and the second concerns a December 1989 transaction in connection with the oil and gas leases in Louisiana. Each will be discussed separately below.

### A. December 1988 Transaction

■ The McMullans argue that an accord and satisfaction occurred in connection with the December 1988 loan transaction in the sum of $150,000.00. James Cook stated that Ed Cook and L.D. McMullan approached him about borrowing $50,000.00 for renovation of the office building and $50,000.00 for Ed Cook's personal use. James Cook testified:

> In fact, Mr. McMullan had taken bankruptcy and these loans were on a nonaccrual.... The monthly oil checks were continuing to be coming to the bank and were being credited to his note.... He came in and talked to us about what we could do as far as keeping the bank from taking possession of the real estate and the oil production. We at that time, and the committee agreed, that if Mr. McMullan would make a $50,000 payment, advance of which money was borrowed by Cook and McMullan on the office building that we would agree to accept the oil payments, whatever the oil production was, for the property that was mortgaged to the bank until such time as Mr. McMullan got his indebtedness paid off at Exchange Bank. And he indicated that at that time we could combine the two oil incomes and set the note up on a long term payout to pay off the balance of his indebtedness.

Record at 50.

L.D. McMullan testified that before he approached James Cook he told Ed Cook, "Well, I've lost the building on account of the

bankruptcy and I'm going to have to talk to him [James Cook] to see what I can do about that." Record at 246.

McMullan further stated:

[W]e need[ed] fifty thousand dollars ($50,000) to do the renovation on the part of the building American General leased so I went to the bank and asked James if Ed and I got the Fifty Thousand Dollars ($50,000) extra and I gave the bank my money, could I redeem the building from the bankruptcy and he said, "No, we can't do it for $25,000." I said, "I wasn't talking about let's get $50,000 between us. I said getting $50,000 each." And he said, "Ok, we might can do that." ... Three or four days later he called me and said, "We can do that."

Record at 246–47.

On December 14, 1988, the bank loaned $150,000.00 to L.D. and Nila McMullan and Ed and Ailene Cook, and, as agreed, $50,000.00 of the loan proceeds were applied to L.D. McMullan's discharged obligation and Nila McMullan's existing obligation under note numbered 87761.[2] The McMullans executed the December 16, 1988, mortgage in the office building in an attempt to secure the $150,000.00 loan.

The McMullans argue that the only "rational explanation" of the $150,000.00 loan transaction is that "[a]n accord and satisfaction occurred. NBC agreed to release its lien [from previous mortgages] on the office building in exchange for a new note which subjected the McMullans to personal liability." Defs.' Reply Br. at 13–14.

However, the evidence here falls considerably short of establishing an accord and satisfaction. None of the witnesses specifically testified that the parties had an understanding that the lesser sum of $50,000.00 borrowed from and then paid to the bank would discharge the McMullans' total indebtedness. James Cook directly denied that any such agreement was reached, and Nila McMullan testified that she never discussed an accord and satisfaction agreement with anyone.

L.D. McMullan offered an opinion that after securing the $150,000.00 loan and paying $50,000.00 on his discharged debt to NBC he "thought everything was taken care of," but he gave no unequivocal testimony evidencing an agreement between the parties.

The evidence does not support the McMullans' assertion that an accord and satisfaction is the only "rational" inference to be drawn from events that occurred. The more reasonable conclusion is that NBC agreed to forbear instituting foreclosure proceedings in exchange for a $50,000.00 payment on a partially discharged debt and continued collection of proceeds from the sale of the oil production. Therefore, the McMullans failed to meet their burden of proof to establish the affirmative defense of accord and satisfaction as to the December 1988 transaction.

## B. *December 1989 Transaction*

The McMullans argue that a second accord and satisfaction occurred in December 1989 in connection with the oil and gas leases in Louisiana. Counsel for the McMullans contends in his brief that the "McMullans further claim that in 1989 they executed and delivered quitclaim deeds to NBC of their interest in the 'Manorado and Bobby Slack' oil and gas properties in Louisiana ... in full satisfaction of any claims NBC had against either L.D. McMullan and/or Nila McMullan." Defs.' Reply Br. at 3.

L.D. McMullan testified that in December 1989 Henry Kinslow, his attorney, advised him that NBC had "agreed to do the balance in lieu of foreclosure." Record at 253. To accomplish that purpose, Kinslow requested L.D. McMullan to pick up three quitclaim deeds from his office and execute them. L.D. McMullan stated that he acquired the deeds, took them to his office in the Union County office building, executed the deeds, and had them witnessed by two of his employees, Kem Lane and Debbie Williams. He then delivered the deeds to James Cook,

---

**2.** L.D. McMullan's personal liability to NBC had previously been discharged in his Chapter 7 proceeding. Whether NBC's demand for a payment on L.D. McMullan's discharged debt violated the discharge injunction provided in 11 U.S.C. § 524(a)(2) (1994) is not an issue before the Court.

who was in the office building visiting Ed Cook on an unrelated matter.

The three quitclaim deeds, on their faces, described oil property located in Sabine, Winn, and Red River Parishes, Louisiana, the same property identified by various witnesses as the Manorado oil leases.[3] On direct examination, L.D. McMullan testified that the quitclaim deeds were for both the Manorado and the Bobby Slack properties. On cross-examination, he testified that he still owned the Bobby Slack oil leases in 1992. On redirect examination, L.D. McMullan contradicted himself again, recalling that the Bobby Slack property was the only property he deeded back to NBC.

Other evidence in the record points out discrepancies in L.D. McMullan's testimony with regard to ownership of the Louisiana oil and gas properties. The McMullans' schedules in this proceeding reflect that only the Manorado properties were conveyed to NBC by quitclaim deed in 1989. But L.D. and Nila McMullan's tax returns for 1989, 1990, 1991, and 1992 indicate that they still owned the Manorado oil properties. L.D. McMullan also stated that NBC lost the original Bobby Slack lease and that a new lease was executed in favor of himself and NBC equally. Further, he said he "reacquired" the Bobby Slack property in December 1990, although his 1990 tax return claimed income and expenses for the entire year of 1990.

The bank's evidence regarding the quitclaim deeds is also confusing. Carol Crafton Anthony, one of NBC's attorneys in 1989, testified by way of deposition.[4] She acknowledged writing a letter dated December 12, 1989, to Henry Kinslow, attorney for the McMullans. In the letter, she stated that she enclosed "deeds in lieu of foreclosure" to the oil and gas interest in Louisiana. Also testifying by deposition, Kinslow recalled receiving the deeds from Anthony and transferring them to L.D. and Nila McMullan. Kinslow testified that the McMullans told him NBC would not pursue Nila McMullan

on the "oil debts; [because] that was L.D.'s problem." Record at 125.

James Cook testified that he did not become aware of the existence of the quitclaim deeds until a year ago when preparing for trial and that he never agreed to accept the quitclaim deeds as satisfaction of NBC's claims. Cook explained that the bank never accepted the quitclaim deeds because:

> [W]e took the position that McMullan was going to do what he said he was going to do. He wanted to continue to try to work out the loan, and there was no need of us taking the property; it belonged to Mr. McMullan. Mr. McMullan had assured us that he was going to do everything he could to work out the loan. It was his collateral; as far as I know, he's still taking tax advantage of it.

Record at 107–09.

Despite Cook's purported lack of knowledge of the deeds, NBC's internal bank records do refer to the documents. A loan review document dated May 14, 1991, commented: "The loan files contain quitclaim deeds executed 12/20/89 by Mr. and Mrs. McMullan conveying ownership of the oil production ... to NBC as a result of relief and abandonment through the bankruptcy court...." Defs.' Ex. 10.

Another loan review report dated July 10, 1992, contains the following analysis of McMullan's financial standing with the bank:

> The $110,000 value he places on his oil production share of ownership is questionable based on oil checks and debt reduction with NBC and the deeding of oil productions to the Bank.... As a result of the chapter 7 bankruptcy the indicated oil properties were abandoned to and deeded to the bank. The deeds have not been recorded as a matter of record, and management states this is due to environmental risks exposure.

Defs.' Ex. 11. In addition, NBC generated an internal report of other real estate owned by the bank as of July 31, 1992. It indicated

---

3. However, attached to the Red River Parish quitclaim deed is a separate document bearing a typewritten description of the Bobby Slack property located in Webster Parish.

4. Carol Crafton Anthony is now a circuit judge in Union County, Arkansas.

NBC owned the oil property described in the quitclaim deeds.

Thus, the evidence does not establish a clear picture of the transactions in question. The quitclaim deeds create uncertainty as to whether they describe both the Manorado and Bobby Slack property. Neither party introduced documentation of the alleged new lease of the Bobby Slack property or of a mortgage of the new lease in favor of NBC securing any debt. Moreover, NBC's own records contradict James Cook's unconvincing testimony that he was unaware of the existence of the quitclaim deeds until recently.

Significantly, the quitclaim deeds purporting to convey NBC title to the oil and gas properties are not acknowledged and have never been recorded; therefore, the purported transfers were not perfected. La.Civ. Code Ann. art. 1839 (West 1987) and La.Rev. Stat.Ann. § 9:2743 (West 1991). In addition, both NBC and the McMullans continued to conduct their respective businesses as if no transfer had occurred.

■ The evidence does suggest that the parties were attempting to effect a voluntary transfer of the oil leases to NBC rather than a transfer of title by a foreclosure action. However, accepting a transfer of collateral in lieu of foreclosure does not extinguish the underlying debt, in the absence of an agreement for an accord and satisfaction to that effect. Even if an agreement had been reached, the attempted conveyance was not fully performed because the deeds were neither acknowledged nor recorded; therefore, the attempted conveyance could not constitute the full performance element necessary to an accord and satisfaction. *North State Fire Ins. Co. v. Dillard,* 88 Ark. 473, 476, 115 S.W. 154, 155 (1908) (holding that an agreement not performed or evidenced by a writing is not a bar to an action on the original debt).

Therefore, the McMullans failed to meet their burden of proof to establish the affirmative defense of accord and satisfaction as to the December 1989 transaction.

*Forged Instruments*

■ The McMullans also allege that some of the relevant instruments involved in the loan transactions with NBC were forged or altered. L.D. McMullan testified that both his and his wife's signatures were forged on a May 7, 1986, mortgage on the office building. He testified that he remembered signing the note referred to by the mortgage, but was certain that neither he nor his wife signed the mortgage.

Nila McMullan testified that she signed neither the note to NBC dated May 7, 1986, for $233,400.00, nor the note to NBC dated May 7, 1986, for $206,550.00. She acknowledged, however, that she signed copies of both notes. She also testified that she did not sign the May 7, 1986, mortgages on the office building nor the attachment to one of the mortgages styled "continuation of mortgage." The McMullans offered no other evidence regarding the alleged forgeries, and they do not dispute the fact that the loan proceeds were paid for their benefit as directed by them.

NBC hired a handwriting expert to examine the documents in question. The witness concluded that the alleged forgeries were, in fact, the McMullans' genuine signatures. Moreover, upon examination of the alleged forgeries at trial, the Court could discern no difference between the handwriting styles on the questioned documents and on other documents known to bear the McMullans' signatures, including their signatures on the bankruptcy petition.

Furthermore, when L.D. McMullan filed his 1987 Chapter 7 petition, he listed as undisputed claims evidenced by the notes and mortgages he now asserts are forgeries. L.D. and Nila McMullan's testimonies on this issue are prevarications. The Court finds that all signatures on the instruments in question are genuine.

*Validity of the Other Indebtedness Clause*

■ The record reflects that the McMullans executed four mortgages of their undivided one-half interest in the Union County, Arkansas, office building.[5] NBC contends

---

**5.** These mortgages were recorded on June 1,

1982 (Pl.'s Ex. 40), May 12, 1986 (Pl.'s Ex. 25),

that the office building acts as security for notes 87761, 87762, and 89334 pursuant to several mortgages, including the 1982, 1986, and 1988 mortgages, because of the future advance or other indebtedness clauses in the documents. The McMullans argue that the clauses do not grant a mortgage in the office building to secure the debts evidenced by notes 87761, 87762, and 89334 because the debts are not the same kind or class of debt as that related to the office building.[6]

The mortgage dated June 1, 1982, contains the following language:

> This conveyance secures all future advancements of every kind and character which [NBC] shall hereafter make to Mortgagor ... for whatever purpose said advances are made or used irrespective of whether they are of the same class as the initial indebtedness described herein.

Pl.'s Ex. 40.

The two mortgages dated May 19, 1986,[7] and the mortgage dated December 16, 1988, contain the following identical clause:

> This mortgage is also given for the further purpose of securing the payment of any and all sums ... of any and every kind now or hereinafter owning [sic] and to become due from the mortgagor to Bank ... during the term of this mortgage, howsoever created, incurred, ... and any and all future advances, notes, indebtedness, advances, or obligation of any type or nature by mortgagors to the Bank ... whether of the same nature or type as those for which the debts herein described were created.

Pl.'s Exs. 25, 31, 43.

■■■ Parties to a loan transaction may agree that a mortgage given to secure a particular debt may also secure some other existing or future debt. *In re Dorsey Elec.*

*Supply Co.,* 344 F.Supp. 1171, 1172 (E.D.Ark. 1972); *In re Ferguson,* 85 B.R. 89, 91 (Bankr.W.D.Ark.1988) (citing *In re Dorsey,* 344 F.Supp. at 1172 and *Hendrickson v. Farmers Bank & Trust Co.,* 189 Ark. 423, 433–34, 73 S.W.2d 725, 729 (1934)). A mortgage lien does not extend to other debts unless the subsequently acquired debts are of the same class as that of the primary debt or so related to the same class that the assent of the mortgagor may be inferred, unless the parties agree otherwise. *In re Ferguson,* 85 B.R. at 91; *Hendrickson,* 189 Ark. at 433, 73 S.W.2d at 729.

Chief Judge George Craycraft stated the reason for the rule in the case of *Union Nat'l Bank v. First State Bank & Trust Co.,* 16 Ark.App. 116, 697 S.W.2d 940 (1985). He explained that "the purpose of such a [rule] is to prevent the extension of a lien by the use of general terms to debts the debtor did not contemplate." 16 Ark.App. at 119, 697 S.W.2d at 941–42 (citing *Bank of Searcy v. Kroh,* 195 Ark. 785, 789, 114 S.W.2d 26, 28 (1938)); *Security Bank v. First Nat'l Bank,* 263 Ark. 525, 532, 565 S.W.2d 623, 627 (1978); *Hendrickson,* 189 Ark. at 433, 73 S.W.2d at 729. However, the court held in *Union National Bank* that the first mortgage lien did extend to all subsequent advances whether related or unrelated to the primary purpose because the future advance clause unambiguously stated that it would do so.

In the instant case, the 1982 mortgage clearly expresses the intent that it will secure all future advancements of every kind, even if the future indebtedness is not of the same class as the original indebtedness.

■■■ The 1986 mortgages unambiguously state the intent of the parties in language virtually indistinguishable from that of the clause sanctioned by Judge Craycraft in *Union National Bank.* Each other indebted-

---

May 12, 1986 (Pl.'s Ex. 31) and December 16, 1988 (Pl.'s Ex. 43).

**6.** The McMullans also argue that the 1982 and 1988 mortgages on the Union County, Arkansas, office building were conveyed to NBC jointly by the McMullans and their partners to secure loans connected with the office building and, therefore, the mortgages secure other loans only if made jointly to all mortgagors. Even if the McMullans' argument has merit, the two 1986 mortgag-

es clearly establish the office building as collateral for antecedent and future dates incurred solely by the McMullans.

**7.** The McMullans argument that the 1986 mortgages on the office building do not secure future advances because they were forged is rejected here because of the previous finding that the 1986 mortgages were not forged.

ness clause asserts that the mortgage secures debts "of any and all kind now or hereinafter [owing]". Pl.'s Ex. 31, 43. The obvious intent of the identical clauses is to extend the mortgage lien as security for obligations of the same as well as different classes, including both existing and future indebtedness. Courts have upheld this type of language as valid and enforceable. *Union National Bank*, 16 Ark.App. at 120, 697 S.W.2d at 942 (holding that where the intention of the parties is expressed in unambiguous terms, the court does not construe this clause but enforces it as written).

■ The 1988 mortgage, as to Nila McMullan's interest in the office building also extends to the office building. However, the 1988 mortgage, as to L.D. McMullan's interest in the office building, cannot be relied on by the parties for a different reason. The office building was listed on L.D. McMullan's Chapter 7 petition filed June 17, 1987, and became property of the Chapter 7 estate. 11 U.S.C. § 541(a) (1994). The order of abandonment was not entered until October 1989; therefore, the office building was still property of the estate at the time the December 16, 1988, mortgage was executed by L.D. McMullan and filed of record. 11 U.S.C. § 541(a) & (c) (1994). At that time, L.D. McMullan had no interest in the office building to convey. Only the trustee, as representative of the estate, had the power to convey property of the estate, and, in this case, the trustee was not so authorized without court approval. 11 U.S.C. §§ 323 & 363(h)(1) (1994). In addition, the taking of the lien in property of the estate would be an act against property of the estate prohibited by 11 U.S.C. § 362(a)(4)–(5) (1994). Whether such act is void or voidable is uncertain.[8]

For the foregoing reasons, the 1982 mortgage extends to future loans made by NBC to the McMullans, the 1986 mortgages secure the McMullans' antecedent and subsequent debt to NBC, and the 1988 mortgage as to Nila McMullan secures Nila McMullan's antecedent and subsequent debt to NBC.

### *Alleged Disposition of Collateral*

■ Nila McMullan asserts that she has been discharged from personal liability on note 87762 for $206,550.00 because NBC made a disposition of certain collateral without notice to her. The McMullans state that NBC held a mortgage lien in an oil and gas lease of the Bobby Slack property in Webster Parish, Louisiana, and a security interest in the oil field equipment used to operate the lease. L.D. McMullan testified that after his Chapter 7 discharge was granted and the existing Bobby Slack lease terminated, he and NBC entered into a new lease of the Bobby Slack properties with each owning a fifty percent interest.

The McMullans argue that the execution of this new lease constituted a disposition of the personal property used in connection with the operation of the lease and that the alleged disposition occurred without notice to Nila McMullan as required by Ark.Code Ann. § 4–9–504 (Michie 1991). They contend that failure to give Nila McMullan the required notice results in a discharge of her liability to NBC on note 87762 for $206,550.00.

■ After a default, a secured party has a right to repossess and dispose of its collateral. Ark.Code Ann. § 4–9–504(1) (Michie 1991). The disposition may be made at pub-

**8.** There is a split of authority among the circuit courts of appeals on the issue of whether an act in violation of the automatic stay should be characterized as "void ab initio" or merely "voidable." The majority holds that such acts are void. *Schwartz v. United States (In re Schwartz)*, 954 F.2d 569 (9th Cir.1992); *Job v. Calder (In re Calder)*, 907 F.2d 953 (10th Cir.1990); *Smith v. First Am. Bank (In re Smith)*, 876 F.2d 524 (6th Cir.1989); *In re Ward*, 837 F.2d 124 (3rd Cir. 1988); *48th St. Steakhouse, Inc. v. Rockefeller Group, Inc. (In re 48th St. Steakhouse, Inc.)*, 835 F.2d 427 (2d Cir.1987), *cert. denied*, 485 U.S. 1035, 108 S.Ct. 1596, 99 L.Ed.2d 910 (1988);

*Matthews v. Rosene (In re Matthews)*, 739 F.2d 249 (7th Cir.1984); *Borg–Warner Acceptance Corp. v. Hall*, 685 F.2d 1306 (11th Cir.1982); *In re Smith Corset Shops Inc.*, 696 F.2d 971 (1st Cir.1982). However, every majority circuit has recognized the possibility of retroactively validating acts in violation of the stay in limited circumstances. *E.g. Easley v. Pettibone Michigan Corp.*, 990 F.2d 905 (6th Cir.1993). The minority view is that an act in violation of the stay is merely voidable. *Jones v. Garcia (In re Jones)*, 63 F.3d 411 (5th Cir.1995); *Bronson v. United States*, 46 F.3d 1573 (Fed.Cir.1995). The Eighth Circuit has not directly addressed this issue.

lic or private sale and reasonable notification of the time and place of "any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor." Ark.Code Ann. § 4–9–504(3) (Michie 1991). If this section is not complied with, the creditor is not entitled to a deficiency judgment unless the secured party proves that the reasonable value of the collateral was less than the debt. *Marks v. Powell,* 162 B.R. 820, 829 (E.D.Ark. 1993) (citing *Henry v. Trickey,* 9 Ark.App. 47, 48, 653 S.W.2d 138, 139–40 (1983)). *See also Bank of Bearden v. Simpson,* 305 Ark. 326, 331, 808 S.W.2d 341, 344 (1991) (holding creditor who sold personalty in violation of the Code could pursue the remainder of the debt by foreclosing against real property which also served as collateral, but deficiency would not exceed the difference between the reasonable value of the personalty at the time of sale and amount of obligation at the time of sale of personalty occurred).

The documents underlying the conveyance of the oil and gas field equipment are found in Pl.'s Ex. 2, p. 7; Pl.'s Ex. 9, p. 7–8; Pl.'s Ex. 10, p. 7–8; Pl.'s Ex. 11, p. 7; Pl.'s Ex. 12, p. 6. These exhibits purport to convey oil and gas working interests and personal property used in the oil and gas operation and are the same documents the debtors argue create no ownership interest in Nila McMullan. Witnesses identified the "Bobby Slack" oil lease as being in Webster Parish, Louisiana, where presumably the oil and gas equipment was also located. The instrument conveying the Bobby Slack oil lease and attendant oil and gas field equipment is not in the record. Not only is there no evidence of the extent of Nila McMullan's ownership in the Bobby Slack operation, there is no credible evidence that NBC disposed of any property or used any of her property in any manner without her consent. *Zuppas v. General Elec. Credit Corp.,* Nos. 86–1148, 86–1157, 1987 WL 36919, at *2 (4th Cir. Mar. 27, 1987) (stating that language of § 9–504 focuses on sales, leases, and other exchanges of collateral for cash or accounts); *General Elec. Capital Corp. v. Vashi,* 480 N.W.2d 880 (Iowa 1992) (stating that § 9–504(1) & (2) suggests an actual transfer of an interest in the collateral by sale, lease, or contract). The fact that her husband and NBC apparently used the equipment in a cooperative venture is consistent with use of the property with her express or implied consent. She never testified otherwise.

The only testimony concerning the issue by the plaintiff was the testimony of L.D. McMullan as follows:

Q: And the Bobby Slack property was the only property that you deeded back to the bank. Is that also correct?

A: Yes, sir.

Q: After you and Mrs. McMullan deeded the Bobby Slack property back to the bank, what happened to that oil gas lease?

A: They lost it.

Q: The bank lost the lease?

A: They lost the lease.

Q: Now, as I understand from previous testimony, there was a new lease of the Bobby Slack property. Is that correct?

A: Yes, sir.

Q: And who were the participants in the new lease of the Bobby Slack property?

A: Myself and National Bank of Commerce.

Q: How much was your interest in the new Bobby Slack lease?

A: Fifty percent (50%).

Q: How much was the bank's interest in the new Bobby Slack lease?

A: Fifty percent (50%).

Q: What equipment is being used to operate that new lease that you and the bank are operating?

A: That equipment that was on the wells.

Q: The same equipment?

A: Yes, sir.

Q: So, in essence, someone new is using that equipment to operate those leases?

A: Yes, sir.

Q: You and the bank and—now, did you or the bank ever send Nila McMullan

notice that the bank was going to start using that equipment for it's [sic] own purposes?

A: No, sir.

Record 310–11.

Q: Mr. McMullan, do you have any personal knowledge not obtained through conversations with anyone else, but actual knowledge personally obtained by seeing or observing that the bank—National Bank of Commerce was in possession of any personal property that came from the Manorado or Bobby Slack oil properties?

A: I saw the gas compressors and the pull machine, things like that.

Q: Where did you see this?

A: Down in Many, Louisiana.

Q: Did you—but, I'm asking did you see them in the possession of any—an agent or any employee or other person associated with National Bank of Commerce?

A: Well, James Cook was the Chairman of the Board of Manorado and I think he was Chairman of the Board of the bank. Is that the same thing?

The Court: Well, he's asking did you see the bank as an entity in possession of any of the property by an agent acting on behalf of the bank. That's what he's asking. Have you or have you not?

A: If you call him an agent of the bank, I would say that I probably did.

Q: Where did you see Mr. Cook in possession of this property you just described—Mr. James Cook? Where did you see this?

A: He was Chairman of the Board of Manorado.

Q: But where did you see him in his capacity—

A: You mean, carrying it off by hand or something?

Q: Yeah.

A: No, sir. I hadn't seen him carry it off by hand.

Q: Did you ever see it in his physical custody?

A: If you mean personally got a hold of it or by virtue of him being the chairman of the company would have been in control of it. Which one?

Q: In his capacity as an officer of the National Bank of Commerce?

A: He would have had control of it.

Q: He would have had control of it in his capacity as an officer of National Bank of Commerce. Is that your testimony?

A: And an officer of Manorado.

Q: No, I'm not asking as an officer of Manorado. I'm asking—

The Court: Let's go on to something else. He's not going to answer your question.

Q: Mr. McMullan, you don't have any personal knowledge that the National Bank of Commerce ever took possession and sold any of the property—personal property related to the Bobby Slack or Manorado properties, do you?

A: No, not me, personally.

Record 307–309.

The McMullans have failed to establish any violation of Ark.Code Ann. § 4–9–504 (Michie 1991).[9]

### Violation of ECOA

■ The McMullans contend that because the loan proceeds of notes 87761, 87762, and 89334 were used for L.D. McMullan's business and Nila McMullan had no ownership interest in the collateral, NBC violated the Equal Credit Opportunity Act,

---

9. The McMullans' brief is unclear as to whether they are also arguing that the bank disposed of the Manorado oil and gas equipment used in connection with the Manorado lease. The debtors do not distinguish the oil and gas lease interest (real property) from the oil and gas field equipment (personal property) and refer to all of it in unspecific terms such as Manorado, Bobby Slack, Louisiana oil properties, oil and gas properties in Louisiana, and the properties.

The McMullans argue simultaneously that (1) Nila McMullan owned no property interest in the oil and gas leases and equipment; (2) Nila McMullan conveyed her interest in the Manorado "oil and gas properties" to NBC, and (3) she owned an interest that was not mortgaged to NBC and that NBC disposed of her interest without giving her the required notice.

15 U.S.C. § 1691 (1994), by requiring her to execute the notes. The evidence, however, directly contradicts the McMullans' argument.

Section 1691 prohibits a lender from requiring a spouse to join in the loan of another spouse unless the latter does not meet credit requirements. 15 U.S.C. § 1691 (1994). The law also provides:

> A request for the signature of both parties to a marriage for the purpose of creating a valid lien, passing clear title, waiving inchoate rights to property, or assigning earnings, shall not constitute discrimination under this subchapter.

15 U.S.C. 1691d(a) (1994).

Cases interpreting this provision have permitted lenders to require both spouses' signatures on loan documents in certain circumstances. *In re DiPietro*, 135 B.R. 773, 777 (Bankr.E.D.Pa.1992) (holding that the bank logically required wife's signature on a term note in addition to her husband's signature where, under state law, bank could obtain security in husband's property only by having wife be co-obligor); *Resolution Trust Corp. v. Townsend Assocs. Ltd. Partnership*, 840 F.Supp. 1127, 1142 (E.D.Mich.1993) (ruling that creditor's requiring wife's personal guarantee in addition to her husband's, after his default on original loan, was not a pretext for discrimination where husband and wife jointly owned assets listed on financial statement and husband did not separately own sufficient assets to be credit worthy).

No one disputes that L.D. and Nila McMullan were husband and wife and that they were domiciled in Union County, Arkansas, at all relevant times. L.D. McMullan testified that Nila McMullan never owned any interest in the Manorado and Bobby Slack oil and gas leases or the attendant personal property. At trial, he stated:

> Q: Well, you've heard some testimony that her name appears on certain documents showing that—in particular, the Manorado properties owned by L.D. McMullan and Nila McMullan as husband and wife. What is your response to that?

> A: In Louisiana, you put—if a man is married, you put the husband and wife. If he was unmarried, you put an unmarried man. If he's a widow, you put the widow of this certain woman. You have to put the woman's name in Louisiana, but if she's going to have an interest you want to spell out what her interest is for her to have an interest.

Record at 240.

The evidence of the interest the McMullans acquired in the oil and gas leases and personal property was a series of nine documents styled as assignments or sale and assignments. These documents contain a description of the property conveyed and the names of the grantors and grantees. The grantees were listed as follows:

Pl.Ex. 2 L.D. McMullan and Nila McMullan, Husband and Wife

Pl.Ex. 3 L.D. McMullan and Nila McMullan, Husband and Wife

Pl.Ex. 4 L.D. McMullan, the husband of Nila McMullan

Pl.Ex. 5 L.D. McMullan and Nila McMullan, Husband and Wife

Pl.Ex. 6 L.D. McMullan and Nila McMullan, Husband and Wife

Pl.Ex. 9 L.D. and Nila McMullan

Pl.Ex. 10 L.D. and Nila McMullan

Pl.Ex. 11 L.D. and Nila McMullan

Pl.Ex. 12 L.D. and Nila McMullan

The testimony presented concerning the McMullans' interest in the Bobby Slack property was vague and inconclusive. The instrument conveying the Bobby Slack properties to the McMullans was not introduced.

■■■■ The law governing Nila McMullan's interest in these estates depends on whether the property is real or personal. Oil and gas leases are real property under both Arkansas and Louisiana law. *Clark v. Dennis*, 172 Ark. 1096, 1097, 291 S.W. 807, 808 (1927) (citing *Standard Oil Co. v. Oil Well Salvage Co.*, 170 Ark. 729, 738, 281 S.W. 360, 363 (1926)); La.Rev.Stat.Ann. § 31:18 (West 1989); *Salvex, Inc. v. Lewis*, 546 So.2d 1309, 1312 (La.Ct.App.), *writ denied*, 551 So.2d 1323 (La.1989); *Northcott Exploration Co. v.*

*W.R. Grace & Co.*, 430 So.2d 1077, 1079 (La.Ct.App.1983). The oil production equipment is personal property. Both the real and personal property in question are located in Louisiana; however, the McMullans' domicile is in Arkansas. Therefore, Louisiana law defines the estate in real property located in Louisiana, La.Civ.Code Ann. art. 3524 (West 1992), and the law of the domicile of the owner defines the estate in personal property located in Louisiana. La.Civ.Code Ann. art. 3523 (West 1992).

 In Louisiana, a conveyance of real property, such as the oil and gas leases, to husband and wife, as by an act of sale, creates an estate of co-ownership between the spouses. *Morrison v. Richards*, 343 So.2d 375, 377 (La.Ct.App.), *writ denied* 345 So.2d 503 (La.1977). Even if real property is acquired in only one spouse's name, the estate is community property except in certain circumstances not present here. La.Civ.Code Ann. art. 2341 (West 1985). Community property consists of "property acquired during the existence of the legal regime through the effort, skill, or industry of either spouse; property acquired with community things or with community and separate things." La. Civ.Code Ann. art. 2338 (West 1985). In addition, all obligations incurred by a spouse during the existence of a community property regime for the common interest of either or both spouses is a community obligation. La.Civ.Code Ann. art. 2360 (West 1985). A debt incurred by either spouse during the existence of a community property regime is presumed to be a community obligation. La. Civ.Code Ann. art. 2361 (West.1985).

 In this case, the McMullans offered no evidence or argument that L.D. McMullan acquired the leases with his separate property. Therefore, the McMullans' oil and gas leases are community property under Louisiana law because these holdings were acquired during the marriage with the community's credit. Specifically, if L.D. McMullan owns an interest in the Manorado and Bobby Slack properties, then Nila McMullan owns an undivided one-half of those leases, both those assigned to her and her husband and those assigned solely to her husband during the course of their marriage.

Further, the McMullans' community is responsible for the debts incurred by either spouse in acquiring the leases. *Cabral v. Cabral*, 543 So.2d 952 (La.Ct.App.1989) (holding that husband's unsuccessful real estate venture incurred obligations to the community because wife failed to prove that the community would not have profited if the venture had succeeded), *writ denied*, 548 So.2d 328 (La.1989).

 With regard to the personal property, the same conclusion is reached under applicable Arkansas law. A conveyance of personal property to a husband and wife creates a co-tenancy, which is either a tenancy by the entirety or a tenancy in common. *Ramsey v. Ramsey*, 259 Ark. 16, 19, 531 S.W.2d 28, 30 (1975) (citing *Terral v. Terral*, 212 Ark. 221, 232, 205 S.W.2d 198, 203 (1947)); *Black v. Black*, 199 Ark. 609, 614, 135 S.W.2d 837, 840 (1940) (citing *Union & Mercantile Trust Co. v. Hudson*, 147 Ark. 7, 8, 227 S.W. 1, 3 (1921); *Dickson v. Jonesboro Trust Co.*, 154 Ark. 155, 157, 242 S.W. 57, 59 (1922)).

Because Nila McMullan owned a co-interest in all the collateral, real and personal, that L.D. McMullan owned, NBC was justified in requiring her to execute both the notes and mortgages in order to create a valid lien. The Equal Credit Opportunity Act permits such a purpose. 15 U.S.C. 1691d(a) (1994). Therefore, NBC did not violate the Equal Opportunity Credit Act.

### The Appropriate Remedy

 NBC seeks a personal judgment against Nila McMullan and a judgment foreclosing its lien in the oil and gas leases and related personal property of L.D. and Nila McMullan. As stated herein, NBC has established the amount of its claim against L.D. and Nila McMullan. NBC claims a mortgage on a lease of the Bobby Slack oil production, with NBC and L.D. McMullan each an owner of a fifty percent interest. No such lease or mortgage from L.D. McMullan to NBC appears in the record. Further, as explained earlier, the validity of the 1988 mortgage executed while the office building

834

was property of L.D. McMullan's bankruptcy estate is in serious question.

The appropriate remedy is dictated in a substantial part by the history of the litigation between the McMullans and NBC. NBC filed the foreclosure action on November 13, 1992. On September 23, 1993, the McMullans' counsel filed a motion to withdraw, which was granted. Trial on the merits was set for Monday, January 3, 1994, but was continued at the McMullans' request to February 11, 1994. The case was continued a second time on the McMullans' motion because NBC had failed to produce records in a timely fashion. The trial was re-scheduled for May 27, 1994. On April 15, 1994, the McMullans, without leave of court, filed an extensive counterclaim raising numerous new issues. The case was again re-scheduled for June 23, 1994.

On May 10, 1994, counsel for the McMullans withdrew from the case. New counsel for the McMullans promptly filed a motion to disqualify counsel for NBC. The McMullans filed another motion for continuance on June 20, 1994. The motion to disqualify counsel for NBC was denied June 27, 1994.

On July 22, 1994, the McMullans filed a motion for summary judgment followed by a motion to bifurcate and transfer to circuit court. The matter was still scheduled for trial on the merits on August 19, 1994, when on August 18, the McMullans filed a motion to dismiss the counterclaim and on the same day, new counsel for Nila McMullan filed on her behalf a voluntary petition for relief under the provisions of Chapter 13. Her schedules reflected assets of $1,370.00 (including her two poodles), unsecured liabilities of $467,434.64, a monthly income of $400.00 per month, and monthly expenses of $4,949.40.

On August 19, 1994, Nila McMullan removed the entire chancery court case to the United States District Court for the Western District of Arkansas.[10] The district court remanded the portion of the case against L.D. McMullan to chancery court where it was re-set for trial on the merits on December 22, 1994. The portion of the case against Nila McMullan was referred to this Court.

Finally, at this Court's suggestion, the Chapter 13 case was dismissed, and L.D. and Nila McMullan filed for protection under Chapter 11. The case against L.D. McMullan was removed to this Court on December 20, 1994, to be consolidated with the case against Nila McMullan already pending. Trial on the merits was scheduled for May 15, 1995, in the Bankruptcy Court. On March 15, 1995, counsel for the McMullans moved for one more continuance, which was denied.

The McMullans have been in default on their obligations to NBC for more than eight years. This narrative of the case's procedural history illustrates how the McMullans have successfully averted trial for an unreasonable length of time. Nila McMullan's Chapter 13 filing is the most egregious example of the McMullans' bad faith. When Nila McMullan filed her Chapter 13 bankruptcy petition, the jurisdictional limit in a Chapter 13 case for noncontingent, liquidated, unsecured debts was $100,000.00. 11 U.S.C. § 109(e) (1988).[11] Nevertheless, she scheduled $467,434.64 in unsecured debts that were neither characterized as contingent nor unliquidated. Her counsel argued at a hearing on a motion to dismiss the Chapter 13 proceeding that the unsecured debts were contingent because they were disputed and, therefore, the debts should not be considered for purposes of determining whether the jurisdictional limit was exceeded. This argument is without any legal foundation.[12] Nila

10. The removal petition should have been filed in the bankruptcy clerk's office, not the district court clerk's office. 28 U.S.C. §§ 157(a), 1334, 1452 (1994), Fed.R.Bankr.P. 9027(a), 9001(3), Local Rules U.S.D.C. Eastern and Western Districts of Ark. F–2II(c).

11. The jurisdictional limit for unsecured debts was subsequently raised to $250,000. Bankrupt-

cy Reform Act of 1994, 11 U.S.C. § 109(e) (1994).

12. The law is well-settled that disputing a claim does not make it a contingent debt. *Nicholes v. Johnny Appleseed (In re Nicholes)*, 184 B.R. 82 (9th Cir. BAP 1995); *Gould v. Gregg, Hart, Farris & Rutledge, (In re Gould)*, 137 B.R. 761, 764 (W.D.Ark.1992) (citing *Craig Corp. v. Albano (In re Albano)*, 55 B.R. 363, 368–69 (N.D.Ill.1985)

McMullan was clearly ineligible for relief under the provisions of Chapter 13 because the amount of her unsecured debt greatly exceeded the jurisdictional limit.

Nila McMullan was also ineligible for relief under the provisions of Chapter 13 because she had no regular income as required by 11 U.S.C. § 109(e) (1994). Her schedules reflected no income for the two years immediately preceding the filing of the bankruptcy petition, and, in fact, she testified that she was essentially a housewife who did part-time bookkeeping for her husband. She said she had only recently started receiving a $400.00 per month salary. The household expenses she listed exceeded her gross income by $4,549.40 a month. Finally, the Chapter 11 schedules filed in early 1995 reflect that Nila McMullan has no income.

The Court believes that the purported salary to Nila McMullan listed in the Chapter 13 case was a contrivance, that she had no regular income of $400.00 per month, and that she was acting in bad faith when she contended otherwise. The only reason for filing the Chapter 13 case on behalf of Nila McMullan was to secure another delay in a trial on the merits of the foreclosure action through an intervention of the automatic stay under 11 U.S.C. § 362 (1994).

The defenses advanced at the trial on the merits in this Court were mostly frivolous. The argument that an assignment and sale of an oil and gas interest to L.D. and Nila McMullan did not create a co-ownership interest in Nila McMullan best exemplifies the frivolous nature of the defenses raised by the McMullans. The time has come to liquidate the property in question and distribute the sale proceeds according to law.

The Bankruptcy Code makes no provision for the sale of property by foreclosure. Instead, property sold under the Bankruptcy Code is governed by 11 U.S.C. § 363 (1994). The Court has previously ordered that a trustee be appointed in a related case [13] and that this case be administratively consolidated with the related case with the trustee being responsible for the administration of both cases. Therefore, upon the appointment of the trustee in this case, he is directed to liquidate the McMullans' interest in the office building and Bobby Slack oil and gas production lease and oil and gas field equipment by such method as the trustee deems appropriate, including sale of the interest of a non-debtor.[14]

At any such sale, NBC shall not be entitled to offset bid any of its claimed liens or security interest under 11 U.S.C. § 363(k) (1994) because the validity of its liens and security interests are unresolved.[15] All sales shall be free and clear of liens with liens and other claims of ownership attaching to the proceeds of the sale. The proceeds will be subsequently distributed as provided by the Bankruptcy Code at the request of any party in interest.

The Court determines the claims of NBC against Nila McMullan personally to be $639,042.00 and against L.D. McMullan personally to be $29,248.36. The balance of the claim against L.D. McMullan will constitute a secured claim only to the extent of any perfected mortgage lien or perfected security interest in property of the estate.

IT IS SO ORDERED.

and *In re Pennypacker,* 115 B.R. 504, 507 (Bankr. E.D.Pa.1990)).

13. The related case is Case No. 87–11087 in the Western District of Arkansas, El Dorado Division.

14. During the pendency of this case NBC has obtained an order of abandonment of the Manorado properties. Therefore, the sale will not include either the real or personal property in the Manorado oil property.

15. The parties apparently assumed perfection under Arkansas law; however, the issue of perfection as to the leasehold equipment and the oil and gas leases in connection with the Bobby Slack property are to be determined under Louisiana law. Ark.Code Ann. § 4–9–103(1)(b) (Michie 1991); La.Rev.Stat.Ann. § 10:9–103(1)(b) (West 1992); La.Rev.Stat.Ann. § 9:5373, :5367–69, :5371 (West 1992); La.Rev.Stat.Ann. § 31:203 (West 1992).